**BAILEY EMPLOYMENT SYSTEM, INC., Plaintiff,**

v.

**Clifford HAHN, et al., Defendant.**

**Civ. No. B-79-210.**

United States District Court, D. Connecticut.

April 26, 1982.

Madeleine F. Grossman, New Haven, Conn. (Wiggin & Dana, New Haven, Conn., of counsel), for defendant Clifford Hahn.

Dion W. Moore, Bridgeport, Conn. (Pullman, Comley, Bradley & Reeves, Bridgeport, Conn., Donald Wetmore, Wetmore & Martin, Huntington, Conn., of counsel), for plaintiff Bailey Employment System, Inc.

## MEMORANDUM OF DECISION

DALY, District Judge.

In May, 1979, Bailey Employment Systems, Inc. commenced this action seeking payment of a $10,000 note. The defendant, Clifford Hahn, admitting the existence and execution of the note, counterclaimed against Bailey and its president Sheldon Leighton alleging misrepresentation and fraud as well as violations of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. § 42–110a *et seq.*, by Bailey in connection with the sale of a franchise to Hahn.

The case was tried to this Court on September 25 and 26, 1980, and the Court subsequently ruled that Hahn had failed to demonstrate a claim for misrepresentation and fraud. With regard to Hahn's claim under the Unfair Trade Practices Act, the Court, relying on *Naylor v. Case and McGrath*, 585 F.2d 557 (2d Cir. 1978), in which the Second Circuit ordered this Court to abstain from interpreting CUTPA in the absence of state judicial authority, declined to rule on the CUTPA claims. (Memorandum of Decision, December 12, 1980, pp. 1–2). Consequently judgment was entered for Bailey on the original complaint.

Hahn appealed this ruling to the Second Circuit, *Bailey Employment System v. Hahn*, 655 F.2d 473 (2d Cir. 1981). The Court of Appeals, distinguishing *Naylor, supra*, remanded the case to this Court with instructions to construe CUTPA despite the lack of Connecticut authority, and to apply the statute to the facts adduced at trial. *Id.* at 478. The Court of Appeals, noting § 110b(b) of CUTPA,[1] directed that, in interpreting the state statute this Court should be guided by rulings of the Federal Trade Commission and the federal courts respecting § 5(a)(1) of the Federal Trade Commission Act (FTCA)[2] and by relevant

---

**1.** Section 42–110b(b) of CUTPA provides:

"It is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the federal trade commission and the federal courts to section 5(a)(1) of the Federal Trade Commis-

sion Act, 15 U.S.C. 145(a)(1), as from time to time amended."

**2.** That section provides:

"Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce are declared unlawful."

cases from other states as well as by existing Connecticut authority. It is to that task that the Court now applies itself.

The Connecticut Unfair Trade Practices Act provides in pertinent part:

"(a) No person shall engage in unfair methods of competition and unfair and deceptive acts or practices in the conduct of any trade or commerce.

\* \* \* \* \* \*

d) It is the intention of the legislature that this chapter be remedial and be so construed."

Conn.Gen.Stat. § 42–110b.

The statute prohibits any "person" from engaging in unfair or deceptive acts or practices in the conduct of any "trade or commerce." The terms "person" and "trade or commerce" are defined very broadly:

"(3) 'Person' means a natural person, corporation, trust, partnership, incorporated or unincorporated association, and any other legal entity; and

(4) 'Trade' and 'commerce' means the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state."

Conn.Gen.Stat. § 42–110a.

■ A franchise, as a form of license or privilege to do business under another's name or pursuant to another's marketing plan or system,[3] is certainly a "commodity or thing of value". Thus, the sale of a franchise would appear to clearly fall within the statutory definition of "trade or commerce." Bailey, as a corporation engaged in business, as well as its president, Sheldon Leighton, co-defendant on the counterclaim, equally clearly are encompassed within CUTPA's definition of "person."[4]

It is apparent from the similarity of language used that CUTPA was intended to mirror the federal prohibition and that the Connecticut legislature intended in enacting CUTPA to incorporate the whole body of federal law which had developed around the federal statute.

**3.** *See* Connecticut Franchise Act, Conn.Gen. Stat. § 42–133e(b).

Subsequent to the trial in this case, the Connecticut Supreme Court construed CUTPA for the first time in *Hinchliffe v. American Motors Corp.*, 43 Conn.L.J.No. 3 at p. 14, —— Conn. ——, 440 A.2d 810 (July 21, 1981). Ruling that the Act is remedial and goes beyond the scope of common law actions for fraud and misrepresentation, the highest court of Connecticut stated:

"The act proscribes a broader range of conduct than did the common law for innocent misrepresentation. In deciding what constitutes an unfair or deceptive act or practice, courts of this state are encouraged to look to interpretations of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), rendered by both the federal trade commission and the federal courts. For the plaintiff victimized by such conduct, CUTPA provides an action more flexible and a remedy more complete than did the common law."

*Cf. F. T. C. v. Sperry & Hutchinson*, 405 U.S. 233, 243–44, 92 S.Ct. 898, 904–905, 31 L.Ed.2d 170 (1972), (the unfair trade practices condemned by § 5(a)(1) of the Federal Trade Commission Act are not confined to those that are illegal under the common law.)

■ Under the common law in Connecticut, a person who claims he has been the victim of fraud or misrepresentation must show

1) that a representation as to a factual matter was made and the representation was false;

2) that the representation was known to be false by the party making it;

3) that the representation was made to induce the recipient to act upon it to his detriment; and

**4.** The FTC and federal courts long treated franchisors and the sale of franchises as within the scope of the FTCA. *See e.g.* National Dynamics Corp. v. F. T. C., 492 F.2d 1333 (2d Cir. 1974); Amway Corp., Inc., 93 F.T.C. 618 (1979); Fuqua Industries, Inc., 85 F.T.C. 93 (1975).

4) that the recipient did so act. *Paiva v. Vaneck Heights Construction Co.,* 159 Conn. 512, 514, 271 A.2d 69 (1970). In addition, the misrepresentation generally must relate to an existing or past fact.[5] *Id.*

In contrast the Connecticut Supreme Court has established in *Hinchliffe, supra,* that a party alleging a violation of CUTPA need not prove that he relied on the representation, nor that it was a basis of the bargain:

> "The increased flexibility of the [statutory] action stems from the absence of certain obstacles to recovery under the common law action. The . CUTPA plaintiff need not prove reliance or that the representation became part of the basis of the bargain."

*Hinchliffe v. American Motors Corp., supra,* 43 Conn.L.J.No. 3 at 17, —— Conn. at —, 440 A.2d 810. *See also Slaney v. Westwood Auto, Inc.,* 366 Mass. 688, 322 N.E.2d 768 (1975); (Supreme Judicial Court of Massachusetts similarly construing the Massachusetts unfair practices law which in substance is identical to CUTPA).

In addition, federal precedents have established that for a representation to be unlawfully deceptive, it is not necessary that the seller have intended to deceive. *See, e.g., Porter & Dietsch Inc. v. F. T. C.,* 605 F.2d 294, 308–9 (7th Cir. 1979); *Beneficial Corp. v. F. T. C.,* 542 F.2d 611, 617 (3d Cir. 1976), *cert. denied* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977); *F. T. C. v. Sterling Drug,* 317 F.2d 669, 674 (2d Cir. 1963); *Gimbel Bros. v. F. T. C.,* 116 F.2d 578, 579 (2d Cir. 1941).

Moreover, federal courts have held that a statement which is literally true may, nonetheless, be unlawfully deceptive.

> "The courts are no longer content to insist simply upon the 'most literal truthfulness' . . . for we have increasingly come to recognize that 'Advertisements as a whole may be completely misleading although every sentence separately considered is literally true. This may be because things are omitted that should be said, or because advertisements are composed or purposefully printed in such a way as to mislead.' "

*F. T. C. v. Sterling Drug, Inc., supra,* 317 F.2d at 675 (citations omitted).

Finally, the FTC and federal courts, as well as a number of state courts, have ruled that a failure to disclose pertinent information may be as deceptive an act as an affirmative misrepresentation, and that it is often necessary for a seller to disclose unfavorable facts to avoid misleading purchasers. *See, e.g., Simeon Management Corp. v. F. T. C.,* 579 F.2d 1137, 1145 (9th Cir. 1978); *Warner-Lambert Co. v. F. T. C.,* 562 F.2d 749, 759 (D.C.Cir.1977); *GerRo-Mar v. F. T. C.,* 518 F.2d 33 (2d Cir. 1975). *See also Heller v. Silverbranch Construction Corp.,* 376 Mass. 621, 382 N.E.2d 1065 (1978); *Slaney v. Westwood Auto, Inc.,* 366 Mass. 688, 322 N.E.2d 768 (1975).

The standard established by the F. T. C. and the federal courts to determine if an act or practice is deceptive is whether it has a *tendency* or *capacity* to deceive. *See, e.g. Trans World Accounts, Inc. v. F. T. C.,* 594 F.2d 212, 214 (9th Cir. 1979); *Beneficial Corp. v. F. T. C.,* 542 F.2d 611, 617 (3d Cir. 1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977). An identical standard has been suggested by a Connecticut Superior Court in *Covenant Radio Corp. v. Ten Eighty Corp.,* 35 Conn.Sup. 1, 390 A.2d 949 (1977). And, in evaluating that tendency or capacity, it is "not to the most sophisticated readers but rather to the least" that the courts should look. *Exposition Press, Inc. v. F. T. C.,* 295 F.2d 869, 872 (2d Cir. 1961). As the U. S. Supreme Court has noted, under unfair practices statutes

> "[T]here is no duty resting upon a citizen to suspect the honesty of those with whom he transacts business. Laws are made to protect the trusting as well as the suspicious."

---

**5.** There are exceptions for misrepresentation of a future fact coupled with a present intent not to fulfill the promise, *Paiva v. Vaneck Heights Construct Co.,* 159 Conn. 512, 271 A.2d 69 (1970), or for nondisclosure of facts by a party who has a duty to disclose, *Egan v. Hudson Nut Products,* 142 Conn. 344, 114 A.2d 213 (1955).

*F. T. C. v. Standard Education Society*, 302 U.S. 112, 116, 58 S.Ct. 113, 115, 82 L.Ed. 141 (1937).

CUTPA directs the courts of Connecticut to be guided by the interpretations given to the Federal Trade Commission Act by the F. T. C. and the Federal courts. This Court, sitting in diversity, is bound like any other state court to follow the statute's directives. That being so, the Court turns now to apply these general principles to the facts of this case, and in particular, to defendant's counterclaim which alleges that plaintiff-corporation and its president engaged in unfair and deceptive practices in violation of the Connecticut unfair practices statute.

A review of the record indicates that there were a number of misleading statements of fact and failures to disclose pertinent information involved in the sale of the Bailey Employment franchise to defendant. Although such misleading or failure to inform may not be actionable under the common law theory of misrepresentation or fraud, federal judicial and administrative precedents show that they are actionable under CUTPA.

1. *False, Misleading or Unrepresentative Earnings Claims*

Both the F. T. C. and the federal courts have held that a franchisor may not publicize the unusual earnings of a few franchisees without indicating that those earnings are not representative of the majority. *See, e.g. Amway Corp. Inc.*, 93 F.T.C. 618 (1979); *National Dynamics Corp.*, 85 F.T.C. 1053, remanded for clarification and modification, 492 F.2d 1333, 1336 (2d Cir. 1974). In *Ger-Ro-Mar, Inc. v. F. T. C.*, 518 F.2d 33 (2d Cir. 1975), the Second Circuit affirmed those sections of an F. T. C. order which prohibited the franchisor's use of misleading earnings projections. The order approved by the court proscribed the following practices:

"4. Representing, directly or by implication ... that participants in any marketing or sales program will receive, or have the reasonable expectancy of earning or receiving, any stated gross or net amounts, unless in fact, a majority of participants in the community or geographic area in which such representations are made, have achieved the stated gross or net amounts represented, and the representations accurately reflect the amount of time required by such participants to achieve such gross or net amounts.

5. Misrepresenting in any manner, directly or by implication ... the financial gains reasonably achievable by participants in any marketing or sales plan or program of [sic] the commercial feasibility thereof."

518 F.2d at 39, n.7.

The record in this case reveals that there were several misleading, if not false, representations made to Hahn by Bailey and Leighton.

*Misleading Representations by Bailey and Leighton*

■ 1. Prior to Hahn's purchase of the Bailey Franchise, Leighton sent him an undated letter (Defendant's Ex. 504) which stated:

"Volume on a per desk per annum basis goes as high as $90,000 a year and more, but with turnover and factoring in the various management skill levels our present franchisees are willing to exercise, our "average" desk per year volume is more like $36,000."

At trial, Leighton admitted that the $36,000 figure applied only to "tenured" employment counselors—those who had been counselors for at least six months and whose earnings were consequently significantly higher than nontenured counselors. During the 1977 calendar year there were only 18 "tenured" counselors in the entire Bailey system as opposed to at least 80 nontenured counselors. (Defendant's Ex. 518). Had the average volume per desk been computed on the basis of *all* counselors, tenured and nontenured alike, the figure would be a fraction of that claimed, but it would have reflected a true average. The statement regarding the "average" annual desk volume which omitted the term "tenured" was

thus clearly misleading. Even if Hahn did not rely on the omission, the statement constitutes an unfair or deceptive act under CUTPA since reliance need not be shown. *Hinchliffe, supra,* 43 Conn.L.J. at 17, —— Conn. at ——, 440 A.2d 810. The claim that the annual earnings generated by Bailey's "average" counselor was not only misleading, but false, and constitutes a violation of CUTPA.

■ 2. In another written communication to Hahn prior to the sale of the franchise, Bailey claimed that during the recession years of 1974–1976

"Many well managed Bailey Employment Service franchise owners enjoyed job security and financial independence with personal incomes that averaged $500†—$600†—$700† each and every week of the recession."

Defendant's Exhibit 505.

However, the financial statements of Bailey franchises made available for trial indicate that in 1975 and 1976 only four of the 19 reporting franchisees arguably realized income of as much as $500 per week and only one realized up to $700 per week. Since *some* Bailey franchisees earned the amounts claimed, the statement is not totally false, and thus not actionable under a common law misrepresentation theory. However, the implication in the statement is that such personal incomes were enjoyed by a majority of Bailey franchisees, when that was simply not the case. It is precisely this kind of unrepresentative earnings claim which the F. T. C. and the Second Circuit found to be deceptive in *Ger-Ro-Mar, supra.*

The same letter went on to state that: "In 1977 [presumably after the recession of 1974–1976] many of these well-managed Bailey offices added still another 50% to 100% to their previous best earnings. *All people like you."*

Defendant's Exhibit 505 (emphasis in original).

The implication, of course, is that those "many" franchisees who supposedly had earned $500 or $600 or $700 per week in 1974 through 1976, earned anywhere from $750 to $1400 per week in 1977. However,

it was admitted at trial that in 1977 no Bailey franchisee earned as much as $1000 per week from his or her franchise. Bailey's claim then, was clearly unrepresentative of the "majority of participants," *Ger-Ro-Mar, supra,* 518 F.2d at 39, n.7, and is thus a deceptive practice prohibited by CUTPA. The phrase *"All people like you"* makes it plain that Bailey meant to induce people to buy a franchise through such claim.

■ 3. Written communications from Bailey, (Defendant's Exhibits 503, 504) as well as oral communications from Leighton strongly suggested that a new Bailey franchisee would begin earning a living wage after the first six months of operation. Leighton assured Hahn that he would be able to accumulate sufficient funds to repay the $10,000 loan from Bailey during his first year in operation as a Bailey franchisee. However, at the time the representations were made to Hahn in early 1978, the records that were available to Bailey show that no Bailey office which opened in 1975 or 1976 operated at a profit after its first year. In fact, the record indicates that, for the three years prior to Hahn's purchase, only one franchise, the Torrington Connecticut Office appeared to have supported its owner in its first year of operations. *See* Defendants Exhibits 501, ¶ 20–24; 510; 511; 512. Bailey's representations that six-months was the normal start-up time, during which a new owner would have to subsist on his own personal funds, with the concomitant implication that the franchise would begin earning an income for the owner after that time, did not "accurately reflect the amount of time required by . . . participants," *Ger-Ro-Mar, supra,* to begin earning sufficient money to support themselves. Consequently these representations constitute deceptive acts under CUTPA.

■ 4. A Bailey brochure, which Hahn obtained from a business broker and which was clearly intended to entice potential franchise purchasers, set forth "Projected Earnings" of different levels of Bailey franchises. (Defendant's Exhibit 503, p. 3).

The table was clearly meant to indicate to a potential purchaser what earnings he or she could expect from a Bailey franchise. The figures in the "Projected Earnings" table are unrepresentative and, in some instances, without any reasonable basis in fact for any of the three years prior to Hahn's purchase.

For example, the chart listed a projected net income of $33,000 for a franchise with a "Placing Owner and 2 Desks." However, Bailey admitted that in 1975 and 1976 no Bailey franchisee realized a net income of that amount;[6] in 1977, only two of the 14 franchises for which 1977 financial statements were submitted (defendant's exhibit 510) realized net income of over $33,000.[7] The average 1977 net income for Bailey franchises was $17,141.62—just over half of the $33,000 stated projection. The representation that a Bailey franchise would earn $33,000 at a minimum was, therefore, clearly misleading.

Equally as misleading were the "Projected Earnings" figures for "Placing Owner and 2 Desks" and "Managing Owner and 6 Desks." The representations in the table were that the former could gross $75,000 and the latter could gross $150,000 per year. No Bailey franchise realized $75,000 or more in gross income in 1975 (Defendant's Exhibit 508); only three out of 14 franchises realized $75,000 or more in gross income in 1976 (Defendant's Exhibit 509); and only five of 14 franchises had gross receipts of $75,000 or more in 1977. No franchise for which financial statements were available had gross receipts as high as $150,000 in any of the three years preceding Hahn's purchase.

■ Although statements of "projected earnings" of a possible future franchise will always be speculative to some extent, when they are used to entice people into buying a franchise they must bear a reasonable rela-

tionship to the average amounts earned in the past by the majority of existing franchises. See the F.T.C. order approved by the Second Circuit in *Ger-Ro-Mar, supra*, 518 F.2d at 39, n. 7. The statements regarding "projected earnings" in the Bailey brochure are, at best, unrepresentative of the majority of Bailey franchises, and, at worst, made of whole cloth. It is just these kinds of unrepresentative earnings claims which the F.T.C. and the federal courts have prohibited time and again as unlawfully deceptive acts or practices under the FTCA. They are equally unlawful under CUTPA.

### 2. Failures to Disclose

The F.T.C. and the federal courts have ruled that a failure to disclose material facts, including unfavorable facts, which could reasonably influence a purchaser's decision to buy, violates § 5 of the Federal Trade Commission Act. See, e.g. *Warner-Lambert Co. v. F. T. C.*, 562 F.2d 749, 759 (D.C.Cir.1977); *Simeon Management Corp. v. F. T. C.*, 579 F.2d 1137, 1145 (9th Cir. 1978); *Fuqua Industries, Inc., et al*, 85 F.T.C. 93 (1975) (consent order).

Defendant claims that Bailey's failure to disclose both the attrition rate for its franchises as well as the corporation's involvement in litigation with other of its franchisees, constitutes unfair and deceptive acts under CUTPA. In support, defendant cites a report by the F.T.C. setting forth the basis and purpose of a trade regulation rule concerning unfair and deceptive practices in franchising. See 43 Fed.Reg. 59614–59753 (Dec. 21, 1978). The rule specifically declares the failure to disclose information about the franchisor's success (or lack thereof) or reputation as well as information regarding lawsuits brought against the franchisor to be unfair or deceptive acts or practices.

---

6. Of the 15 franchises for which 1975 financial statements were submitted (Defendant's Exhibit 508) the highest annual net income, before allowing for officer's salary, was $24,443 for the Madison, Connecticut office. Of the 14 franchises for which 1976 financial statements were submitted (Defendant's Exhibit 509), the highest annual income, *before* allowing for offi-

cer's salary, was $32,275 for the Ridgefield, Connecticut franchise.

7. The Madison, Connecticut, office's 1977 net income was $66,055; the Ridgefield, Connecticut, office's 1977 net income was $37,564. (Defendant's Exhibit 510).

Bailey argues that, since the rule was promulgated after Hahn purchased his franchise in May of 1978, it can't be applied in this case. However, the fact that the federal regulation was not in effect when Hahn purchased his Bailey franchise is immaterial to this Court's determination of whether Bailey's failure to disclose particular information regarding its track record and reputation is unfair or deceptive under CUTPA. Although § 110b(b) of CUTPA provides that courts of the state shall be *guided by* the interpretations of § 5 of the FTCA by the F.T.C. and the federal courts, they are not limited by such interpretations. As originally enacted, the Connecticut statute provided that state unfair or deceptive acts or practices were to be those "determined to be" unfair or deceptive by the F.T.C. or the federal courts. 1973 Pub.Acts 615, § 2(a). However, the Act was amended in 1976 to provide only that courts in Connecticut were to be "guided by" federal interpretations of § 5 of the FTCA. The purpose of the change apparently was to permit Connecticut's courts to hold practices which had not yet been specifically declared unlawful by federal authorities to be nevertheless unlawful under CUTPA.[8] Thus, even if the F.T.C. had promulgated no specific rule regarding unfair or deceptive practices by franchisors, the Connecticut courts would be free to find such practices unlawful simply if they had the "tendency or capacity" to deceive.

The attrition rate of franchises is certainly material information which would be likely to influence a prospective franchisee's decision to purchase. In this case such information was clearly pertinent to a prospective purchaser, and Bailey's failure to disclose it had the "tendency or capacity" to deceive.

Between January 1, 1967 and May 15, 1978 (when Hahn purchased his franchise), Bailey sold a total of 103 franchises (Defendant's Exhibits 501, ¶ 1; 502). However, by the latter date, there were fewer than 25 Bailey offices still operating, indicating a 75% attrition rate system-wide. Massachusetts, where Hahn set up shop, showed an even greater rate of attrition: Between 1972 and May of 1978, 14 Bailey franchises had been sold in Massachusetts. By the time Hahn purchased his franchise, only two offices remained in business indicating an 86% rate of attrition. Bailey failed to inform Hahn of these highly discouraging facts, which certainly would have influenced a potential purchaser's decision to buy a Bailey franchise. In fact, Bailey represented in a written communication sent to Hahn (Defendant's Exhibit 504) that the Bailey System had "grown to nearly 30 offices." In view of the fact that over 100 franchises had been sold in an 11-year period, and less than 30 were still operational at the end of that time, that statement is most certainly deceptive.

The attrition rate of Bailey franchises was certainly material to prospective franchisees such as Hahn, and the failure to disclose this information, particularly when coupled with the representation that Bailey had "grown" to 30 offices, was an unfair and deceptive act prohibited by CUTPA.

As to Bailey's failure to disclose that it was involved in litigation with several franchisees, the Court hesitates to interpret CUTPA as requiring a franchisor to disclose its involvement in all cases, regardless of the nature of the action, the position of the franchisor as plaintiff or defendant, the claims involved, or the merits of the case. Simply because a franchisor has been involved in litigation will not always be material. However, the fact that lawsuits alleging breach of contract, fraud or misrepresentation or unfair trade practices have been brought by franchisees or that judgments for such practices have been entered against franchisors in favor of franchisees is certainly material to a prospective fran-

**8.** *See Murphy v. McNamara,* 36 Conn.Sup. 183, 187, n.4, 416 A.2d 170 (1980). *See also* Langer and Ormstead, The Connecticut Unfair Trade Practices Act, 54 Conn.Bar J. 388, 387 (Oct. 1980).

chisee's decision whether to purchase a franchise or not.[9]

The F.T.C. stated in its report on the basis and purpose of its December 21, 1978, franchise rule that a

"franchisor's failure to disclose to prospective franchisees lawsuits against the franchisor [is] a factor which might well affect the prospective franchisee's decision to purchase. The information is important because it provides the prospective franchisee with an indication of the types of business practices engaged in by the franchisor and it is therefore indicative of its integrity."

43 Fed.Reg. 59634 (Dec. 21, 1978).

▪ The Connecticut statute, like the federal act, was enacted in an attempt to foster honesty and full disclosure in the conduct of business. Any information—positive or negative—that would affect a buyer's decision whether or not to purchase, must be disclosed by the seller. Considering the broad remedial purposes behind CUTPA, this Court construes that Act to require a franchisor to disclose to prospective purchasers information regarding the franchisor's current involvement in pending lawsuits in which franchisees have alleged breach of contract, fraud, misrepresentation, or unfair and deceptive trade practices, as well as information regarding any judgments entered against the franchisor on such claims.

▪ Here, Bailey was involved in litigation with at least 25 Bailey franchisees between May of 1973 and May of 1978. (Defendant's Exhibit 501, ¶ 27.) In May of 1978, when Hahn purchased his franchise, there were six lawsuits pending in which the franchisees alleged either breach of contract or misrepresentation. Bailey's failure to disclose that fact to Hahn was an unfair and deceptive act or practice under CUTPA.

*Remedies Under CUTPA For Unfair and Deceptive Practices*

The Connecticut unfair practices statute differs from the federal law in that the state law provides private litigants with the right to bring an action, while under the federal law, enforcement is left solely to the Federal Trade Commission. *See, e.g. Alfred Dunhill Ltd. v. Interstate Cigar Co.,* 499 F.2d 232, 237 (2d Cir. 1974). The judicial remedies section of CUTPA, Conn.Gen. Stats. § 42–110g provides in pertinent part as follows:

"(a) Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by Section 42–110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper.

(d) In any action brought by a person under this section, the court may award, to the plaintiff, in addition to the relief provided in this section, costs and reasonable attorneys' fees based on the work reasonably performed by an attorney and not on the amount of recovery .... In any action brought under this section, the court may, in its discretion, order, in addition to damages or in lieu of damages, injunctive or other equitable relief."

Hahn is a "person" (as that term is defined by § 42–110a(3)) who, having been induced to buy a Bailey franchise by representations of Bailey and Leighton, has suffered an ascertainable loss of money (at least the initial $10,000 which he paid for the franchise in May of 1978) as a result of what this Court has found to have been unfair and deceptive acts or practices under § 42–110b. He is thus entitled to relief.

9. It may be that other kinds of lawsuits involving the franchisor may also be material. For example, if a franchisor is involved in litigation that threatens its financial stability, prospective franchisees should be made aware of that fact since their success or failure may depend on the franchisor's stability. However, such a situation is not before this Court, and need not be considered here.

In Connecticut, the general rule for damages in analogous actions for fraud or deceit is the "benefit of the bargain" rule, under which the plaintiff is entitled to recover the difference between the value of what he actually received and the value of what he would have received had the representations been true. *See Clark v. Haggard*, 141 Conn. 668, 673, 109 A.2d 358 (1954) and cases cited therein.

A Texas court has ruled that damages under the Texas unfair trade practices act—similar in substance to Connecticut's statute—should be measured under the same standard. *See United Postage Corp. v. Kammeyer*, 581 S.W.2d 716, 722 (Tex.Civ. App.1979).

However, other courts have calculated damages in actions for unfair and deceptive practices on the basis of restitution, which simply returns the purchaser to the same position he or she was in prior to the purchase. *See, e.g. Fletcher v. Security Pacific National Bank*, 23 Cal.3d 442, 153 Cal.Rptr. 28, 591 P.2d 51, 56 (1979); *Smith v. Kinslow*, 598 S.W.2d 910, 915 (Tex.Civ.App. 1980); *Kugler v. Koscot Interplanetory, Inc.*, 120 N.J.Super. 216, 293 A.2d 682 (1972).

Endeavoring to estimate "what the state court would rule to be its law," *Holt v. Seversky Electronatom Corp.* 452 F.2d 31, 34 (2d Cir. 1971), *quoting Bernhardt v. Polygraphic Co. of America, Inc.*, 350 U.S. 198, 209 (1956), and considering the broad remedial purposes of CUTPA, this Court holds that damages under the Connecticut law should be measured according to a restitution formula.[10] Such a measure will enable the courts to reinstate the misled purchaser to his or her status which existed prior to the purchase. A court is also free, under § 42–110g, to assess punitive damages should it feel that a measure of deterrence is in order.

Under a restitutionary formula, Hahn is entitled to cancellation of the $10,-000 promissory note, and to recovery of the amount he paid Bailey ($10,000 fee plus $3,473 in royalty payments), for a total of $13,473 in actual damages.

In addition, since a number of Bailey's misleading or deceptive representations were blatantly intentional, and since many of the written communications, including the Bailey brochure, appear to have been used to induce not only Hahn but other prospective franchisees to purchase a Bailey franchise, indicating that the deceptions were long-term practices rather than unique acts practiced only upon Hahn, punitive damages, which hopefully will serve as a deterrent to the kinds of unfair and deceptive acts practiced by Bailey, should be assessed. Conn.Gen.Stats. § 42–110g(a).

The statute does not specify how punitive damages are to be measured. However, given CUTPA's broad remedial goals of "eliminating or discouraging 'unfair methods of competition and unfair or deceptive acts or practices,' *Hinchliffe, supra*, 43 Conn.L.J. at 17, —— Conn. at ——, 440 A.2d 810, and the number of deceptive statements made by Bailey, as well as the fact that such statements were apparently part of Bailey's routine "pitch" to prospective franchisees, this Court is of the opinion that double the actual damages or an additional $26,946, should be assessed as punitive damages against Bailey.

Finally, Hahn, as the plaintiff in the CUTPA counterclaim, is entitled to costs of the action plus reasonable attorneys' fees, based on the work reasonably performed by his attorney. Conn.Gen.Stats. § 42–110g(d). Hahn's attorney is directed to file an appropriate submission detailing costs

---

10. The restitution formula as a measurement of damages in an action by an individual under § 110–g of CUTPA finds implicit support in the section of the statute which pertains to enforcement of cease and desist orders issued by the Commissioner of Consumer Protection. Conn.Gen.Stat. § 42–110d(e) provides that a court, in addition to entering an injunction to enforce an administrative cease and desist order,

> "may make such additional orders or judgments as may be necessary to restore to any person in interest any moneys or property, real or personal, which may have been acquired by means of any practices prohibited by this chapter...."

and fees within two weeks of the date of this ruling.

For the foregoing reasons, judgment in this action shall enter for defendant Hahn.

It is So Ordered.