Peter and Ronda AURIGEMMA, d/b/a
Auri, Inc./Arco AM–PM
Mini–Market, et al.

v.

ARCO PETROLEUM PRODUCTS
COMPANY, et al.

Civ. No. H–85–683 (PCD).

United States District Court,
D. Connecticut.

April 16, 1990.

John J. LaCava, Richard W. Farrell, Farrell & Barr, Stamford, Conn., for plaintiff.

Robert Keepnews, Tyler, Cooper & Alcorn, Stamford, Conn., Christopher L. Ulrich, Carter LaPrade, Stanley E. Parese, Tyler Cooper & Alcorn, New Haven, Conn., Richard Stephens, Atlantic Richfield Co., Legal Dept., Los Angeles, Cal., for defendants.

## RULING ON PENDING MOTIONS

### DORSEY, District Judge.

Plaintiffs operated gasoline stations and convenience stores pursuant to an "AM-PM Mini-Market Agreement" and "Lessee Dealer Gasoline Agreement" with defendants (hereinafter "ARCO"). On May 21, 1985, Arco informed plaintiffs that it intended to terminate each petroleum and convenience store operation as of November 30, 1985 by reason of its intended withdrawal from the Connecticut market. *See* 15 U.S.C. § 2802(b)(2)(E), the Petroleum Marketing Practices Act ("PMPA").

Then Arco contracted with Shell Oil Co. for the purchase/sale of numerous Arco properties, including those leased to plaintiffs. Shell offered plaintiffs a Motor Fuel Station Lease, Convenience Store Lease, and Dealer Agreement for the same loca-tions and plaintiffs accepted. In November 1985, Arco's agreements terminated and Shell's agreements were effectuated.

Plaintiff claims the following:

1. Compensation for good will and inventory compensation under the Connecticut Fair Conduct in Franchising Act ("CFCFA"), Conn.Gen.Stat. § 42-133*l* (b).

2. Unfair trade practices under the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn.Gen.Stat. § 42-110b.

3. Breach of the AM-PM Mini-Market Agreement.

4. Fraud.

5. Unjust Enrichment.

Arco's motion for summary judgment as to count one was granted as the business relationship under the Lessee Dealer Agreement did not constitute a petroleum franchise as defined in the Act. Summary judgment was granted to plaintiff on count three alleging a breach of the AM-PM Mini-Market Agreement.

Based upon the parties' compliances with this court's trial preparation order, Arco identified several legal issues as to which the parties disagreed. The instant motion seeks clarification. Specifically, defendant disputes plaintiffs' view of the permissible damages and, if restitution is available, whether Arco is entitled to an offset or credit for benefits that Arco provided during their business relationship. Plaintiffs object to a pretrial determination of appropriate remedies and assert that the court must consider the issue in conjunction with the facts found incident to a finding of liability. Plaintiffs move for summary judgment as to count two, the alleged CUTPA violation.

### I. *CUTPA*

From 1980 to 1985, Arco franchised convenience stores known as "AM/PM mini market franchises." "The AM/PM mini-market agreement under ¶ 3.01 incorporates the AM/PM Store Systems Manual which sets forth the 'AM/PM standards of professional operation' which all operators must follow. The manual provides accounting standards and auditing proce-

dures, as well as inventory and merchandising criteria that control minimum levels of inventory, the size and placement of any signs or promotional materials, specifications for AM/PM employee uniforms, and the exterior appearance and internal layout of the store under a Design Standards Manual." *Aurigemma v. Arco*, 698 F.Supp. 1035, 1041 (D.Conn.1988). Each plaintiff operated an AM/PM convenience store franchise between 1980 and 1985. Plaintiffs also retailed Arco gasoline under a "Lessee Dealer Gasoline Agreement" on the same premises, which was leased from Arco under a "Premises Lease."

In 1985 Arco decided to terminate all of its business operations in the eastern United States. The market withdrawal was part of a restructuring plan undertaken to strengthen Arco. Arco terminated plaintiffs' premises leases and dealer agreements under the PMPA based on its withdrawal from the retail marketing of motor fuel in Connecticut. Arco contends that plaintiffs' AM/PM franchise agreements terminated automatically upon termination of their premises leases.

Summary judgment was granted to plaintiffs on count three because, as a matter of law, termination of the AM/PM Mini–Market Agreements based on withdrawal from the marketing of petroleum was a breach of those agreements. Although the agreements terminated automatically in the event the premises lease terminated, it also provided that in "the event any provisions of this agreement ... provide for termination other than in accordance with applicable law ... they shall not be effective and Company ... shall comply with applicable law." The Connecticut Fair Conduct in Franchising Act ("CFCFA"), Conn. Gen. Stat. § 42–133*l* (b), was found to be applicable and that "termination of the AM/PM agreement must be premised on the good cause standard, applying CFCFA, and not simply the fact that the related lease, under the law pertaining to it, is validly terminated." *Id.* at 1040. Withdrawal from the marketing of petroleum was found not to be "good cause" to terminate the convenience store franchises

and thus liability was found for breach of the AM/PM Mini–Market Agreement.

In the second count, plaintiffs allege a CUTPA violation in the failure to disclose in the "AM/PM mini market franchise offering circular for prospective franchisees" or Uniform Franchise Offering Circular ("UFOC") that the franchises could be terminated in the event of a market withdrawal. Third Amended Complaint, ¶¶ 10, 13. Plaintiffs allege that they relied on the circular and that Arco's misrepresentations and omissions caused significant financial damage by the effective loss of money, time, and effort expended for acquisition and operation of the franchises, the loss of goodwill attributable to such operations, and the loss of future profits and "going concern" value. *Id.*, ¶ 14. Plaintiffs contend that Arco violated CUTPA by: (1) failing to disclose in the UFOC that the AM/PM franchises could be terminated in the event of a petroleum market withdrawal; (2) failing to disclose the number of AM/PM franchises previously terminated, cancelled or non-renewed due to market withdrawal; (3) failing to disclose material information regarding the 1981 midwest market withdrawal; (4) failing to provide an accurate cross-reference sheet in the UFOC; and (5) by unilaterally terminating their AM/PM franchises.

■ CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair and deceptive acts or practices in the conduct of any trade or commerce." Conn.Gen.Stat. § 42–110b. As a corporation, Arco falls within CUTPA's definition of "person." Conn.Gen.Stat. § 42–110a(3). Further, the sale of franchises clearly constitutes the conduct of "trade or commerce." *See Bailey Employment System, Inc. v. Hahn*, 545 F.Supp. 62, 66 (D.Conn.1982), *aff'd mem.*, 723 F.2d 895 (2d Cir.1983).

Plaintiffs also assert that it is undisputed they have suffered an "ascertainable loss of money or property" as a result of Arco's wrongful termination of their AM/PM franchises. CUTPA provides that "[a]ny person who suffers any ascertainable loss of money or property ... as a result of ...

a method, act or practice prohibited by section 42–110b, may bring an action ... to recover actual damages." Conn.Gen.Stat. § 42–110g(a). Arco contests that this aspect of plaintiffs' CUTPA claim is undisputed and correctly asserts that plaintiffs' generalized reference to payment of initial franchise fees and royalties is not conclusive on the issue of damages. Plaintiffs also assert that they never bargained for a franchise that could be terminated in the event of a petroleum market withdrawal. Defendants contend that what each plaintiff did bargain for is a fundamental determination that the jury will have to make and that while plaintiffs may have desired a perpetual franchise, the offering circular stated otherwise. Resolution of this issue is not necessary to deciding the instant motion for summary judgment as it seeks only to establish Arco's liability under CUTPA. *Cf. Hinchliffe v. American Motors Corp.*, 184 Conn. 607, 612–13, 440 A.2d 810 (1981) (the words "any ascertainable loss" do not require a plaintiff to prove a specific amount of actual damages to make out a prima facie case).

■ Arco also raises an issue as to lack of any evidence of a connection between plaintiffs' claims and the public interest. The requirement that private plaintiffs demonstrate that actions challenged under CUTPA have a potential effect on the general consuming public was repealed effective June 8, 1984. *L. Cohen & Co. v. Dun & Bradstreet, Inc.*, 629 F.Supp. 1425, 1432 (D.Conn.1986). However, this amendment has not been given retroactive application. *Id.* Thus, as to plaintiffs' CUTPA claims based upon acts occurring prior to June 8, 1984, they must establish a nexus between such conduct and the public interest. *Sorisio v. Lenox, Inc.*, 701 F.Supp. 950, 962 (D.Conn.1988). CUTPA was enacted to provide additional sanctions to deter unfair trade practices that injure the general consuming public, rather than to provide additional remedies for the redress of private wrongs. *Ivey, Barnum & O'Mara v. Indian Harbor Properties, Inc.*, 190 Conn. 528, 540, 461 A.2d 1369 (1983) (expanded remedies intended to create incentive for private vindication of the public interest). "Under guiding federal law, allegedly deceptive acts or practices which arise out of a private controversy are actionable only if the acts or practices have a potential effect on the general consuming public." *Id.*

Plaintiffs concede that their claims arising out of Arco's alleged failure to make adequate disclosures in the UFOC, some of which were transmitted to plaintiffs prior to June 8, 1984, would be subject to the "public nexus" requirement. Although the contractual dispute underlying the plaintiffs' claims presents a private controversy, it implicates specific and substantial public interests. The franchise disclosure requirements were enacted to remedy abuses in the franchising market and to protect the fundamental public policy of encouraging informed consumer decisions. *See* Plaintiffs' Exhibit J (FTC statement of basis and purpose relating to disclosure requirements and prohibitions concerning franchising). The AM/PM UFOC provided to plaintiffs was the same as that given generally to prospective franchisees. Thus plaintiffs' claim implicates more than their private rights and would serve the public interest by deterring alleged noncompliance with public disclosure requirements.

■ Thus, the issue at bar is whether Arco has committed the unfair or deceptive trade practices alleged by plaintiffs. In determining whether a practice violates CUTPA, courts have considered the following factors:

(1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether in other words, it is within the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, competitors or other businessmen.

*Web Press Serv. Corp. v. New London Motors, Inc.*, 203 Conn. 342, 355, 525 A.2d 57 (1987) (citations omitted). "[A]ll three criteria do not need to be satisfied: a prac-

tice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *McLaughlin Ford, Inc. v. Ford Motor Co.*, 192 Conn. 558, 569 n. 15, 473 A.2d 1185 (1984). An act or practice is considered deceptive under CUTPA if it has "a tendency or capacity to deceive." *Bailey Employment*, 545 F.Supp. at 67 (in evaluating tendency or capacity, the court should look to the least rather than most sophisticated readers). Plaintiffs need not prove reliance or that the alleged unfair or deceptive representation became part of the basis of the bargain. *See Hinchliffe*, 184 Conn. at 617, 440 A.2d 810. Thus a CUTPA violation can be established by showing either an actual deceptive practice or one amounting to a violation of public policy. *Daddona v. Liberty Mobile Home Sales, Inc.*, 209 Conn. 243, 254, 550 A.2d 1061 (1988).

CUTPA provides that courts construing the statute be guided by the interpretations given to the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), by the Federal Trade Commission ("FTC") and the federal courts. Conn.Gen.Stat. § 42–110b(b); *McKeown Distributors, Inc. v. Gyp–Crete Corp.*, 618 F.Supp. 632, 643 & n. 6 (D.Conn. 1985). Plaintiffs allegations as to CUTPA violations arise chiefly from Arco's alleged noncompliance with the FTC's franchise disclosure requirements. *See* 15 U.S.C. § 41, *et seq.;* 16 C.F.R. § 436.1, *et seq.*[1] Further, the regulations underlying the FTC Act, 15 C.F.R. § 436.1, provide that failure to comply with the franchise disclosure requirements is "an unfair or deceptive act or practice within the meaning" of the FTC Act and thus CUTPA.

Arco's responses to plaintiffs' requests for admission outlines the parties agreement as to the applicable standards and their general purposes. *See* Plaintiffs' Exhibit I. The FTC imposes franchise disclosure requirements upon franchisors with respect to prospective franchisees. These requirements can be satisfied by providing an offering circular following the FTC rule, 16 C.F.R. § 436.1, or the UFOC format developed by the Midwest Securities Commissioners Ass'n, plaintiffs' exhibit B. Arco followed the latter in the disclosure documents provided to prospective AM/PM franchisees. The disclosures in the UFOC are provided for the protection of the prospective franchisee and their use and consideration in deciding whether or not to become a franchisee. The parties are in agreement that the UFOC should contain information which would be material to the decision and that the conditions under which a franchisor may terminate a franchisee are material and should be disclosed in the UFOC.

First, plaintiffs contend that the UFOC should have expressly disclosed that a geographic market withdrawal under the PMPA could result in termination of the AM/PM franchise agreement. Arco admits that this was not specifically disclosed but disputes that such disclosure must be made exclusively within the narrative portion of the UFOC.

■ The guidelines for preparation of the UFOC provide that with respect to the franchise and any related agreements the franchisor must disclose "[t]he term and whether such term is affected by any agreement (including leases or subleases) other than the one from which such term arises." Plaintiffs' Exhibit B (Guidelines Item XVII, ¶ 5817(A)). As an illustration, the guidelines state that the franchisor should "[d]escribe any agreement (other than the franchise agreement) that affects the term of the franchise agreement. For example, if termination of the lease of the premises terminates the franchise agreement, disclose such fact here and/or under events of termination below." *Id.* A franchisor is also directed to disclose the conditions, i.e., events of default, under which it may terminate the franchise and is instructed to "[d]escribe any conditions (oth-

---

1. Arco argues that the issues raised by plaintiffs do not lend themselves to summary disposition and that the trier of fact must determine the exact parameters of the bargain between the parties. However, plaintiffs' CUTPA claims arise mainly from disclosures in the UFOC. There is no dispute as to the contents of the UFOC and Arco itself notes that the UFOC speaks for itself and that the issue is the adequacy of what was said therein.

er than defaults) that grant the franchisor the right to terminate. If so state whether such other conditions relate to specific events, such as the failure of the franchisee to attain previous predetermined sales volumes or to meet other standards of market penetration or performance." *Id.*, ¶ 5817(E). Thus, as a condition that would entitle Arco as franchisor to terminate, the FTC's franchise disclosure requirements require that the franchisor disclose that termination of the underlying premises lease would result in termination of the franchise.

It is undisputed that plaintiffs were not terminated for any default of their obligations under the franchise agreement but as a result of Arco's geographic market withdrawal under the PMPA. The AM/PM UFOC does not identify termination of the premises lease as a "[c]ondition[ ] under which Company may terminate." Plaintiffs' Exhibits D–G. In its responses to plaintiffs' requests for admission, Arco admits that, for the four versions of the AM/PM UFOC provided to plaintiffs, "[i]tem 17 ... does not disclose that an AM/PM operator (leasing the premises from Arco) can have his AM/PM franchise terminated in the event the lease terminates." Plaintiffs' Exhibit I, ¶¶ 47–50. The conditions under which a franchisor may terminate are certainly material and would reasonably be thought to influence an individual's decision to purchase a franchise. As noted, "plaintiff[s] need not prove reliance or that the representation became part of the basis of the bargain" to establish a CUTPA violation. *Hinchliffe*, 184 Conn. at 617, 440 A.2d 810. The FTC's interpretive guide provides, as an example of disclosure of the conditions under which a franchisor may terminate, the franchisor may terminate when "the lease on the premises is terminated for any reason." Plaintiffs' Exhibit N at 238.

Arco contends that it was not required to disclose the specific aberrational possibility of a geographic market withdrawal. Plaintiffs do not argue that Arco should have foreseen the specific circumstances that resulted in termination of their franchises but that the "AM/PM UFOC ... clearly does not contain a fair statement that a termination of the plaintiffs' leases would result in a termination of the[ir] franchises." Plaintiffs' Memorandum in Support at 21. The Lessee Dealer Gasoline Agreement and the Premises Lease provided that Arco could terminate either agreement for any of the grounds set forth in the PMPA. Arco then tied the termination of those agreements to the automatic termination of the AM/PM franchise agreement. *See* Plaintiffs' Exhibit O ("In the event the premises lease is terminated for any reason ..., this Agreement shall terminate automatically at the same time that the premises lease terminates."). Although Arco is correct in that it would be unreasonable to require them to disclose the myriad of possibilities which might lead to the termination of the premises lease and petroleum franchise under the PMPA, the interrelation of the agreements and that they were tied together for purposes of termination is material information regarding the term of the franchise agreement and grounds for termination and should have been disclosed in the UFOC.

Although directly contrary to its express admission that "Item 17 ... does not disclose that an AM/PM operator ... can have his AM/PM franchise terminated in the event the lease terminates", Plaintiffs' Exhibit I, Arco now argues that it "did adequately disclose in Item 17 of the UFOC the fact that termination of the premises lease would result in termination of the AM/PM franchise." Arco's Memorandum in Opposition at 7. In the section entitled "term of the franchise" under Item 17, the UFOC provides that "the franchise agreement shall terminate in the event the operator loses its right to possession of the premises" and the operator retains the option for a relocation term if suitable premises are found.

Franchisees are divided into two groups with respect to this disclosure: those who own or lease from third parties, and those who lease from Arco. It makes sense that if an operator loses his right to possession of the premises, his franchise would terminate unless he found a suitable replace-

ment location. Arco contends that any plaintiff in this action who, through lease or purchase, acquired alternate premises would have been eligible for a continuing franchise agreement. However, this argument is specious in light of their consistent contention that the AM/PM franchises terminated automatically when the dealer gasoline agreements and premises leases terminated based upon a market withdrawal. As Arco withdrew from all marketing activities east of the Mississippi River, there would be no location to which plaintiffs could relocate. *See* Plaintiffs' Exhibit I, ¶ 76 (Arco admitted that it had no intention to offer terminated AM/PM franchisees the opportunity to relocate to other locations in the east because there were no such locations due to the market withdrawal).

In any event, the general disclosure relied upon by plaintiff does not sufficiently disclose the intended domino effect a termination of the lease and gasoline franchise was intended to have on the AM/PM agreement. By tying the agreements together, Arco sought to effectively make the AM/PM franchises subject to the PMPA. *See Smith v. Atlantic Richfield Co.*, 533 F.Supp. 264, 267 (E.D.Pa.1982), *aff'd mem.*, 692 F.2d 749 (3d Cir.1983) (termination of AM/PM franchise was not brought within scope of PMPA by interrelation of AM/PM franchise agreement and premises lease). This should have been disclosed in the UFOC. The information would be relevant to the decision to purchase a franchise and the failure to disclose such information was an unfair and deceptive act under CUTPA.[2]

▮ Plaintiffs also contend that Arco violated CUTPA by failing to disclose in the UFOC that it had conducted a market withdrawal from the mid-west in 1981 and that five AM/PM franchises were cancelled or terminated as a result of this withdrawal.

The UFOC requires a franchisor to disclose, for the three year period immediately preceding the close of its most recent fiscal year, the number of franchises cancelled or terminated by the franchisor for failure to comply with quality control standards and for other reasons. Plaintiffs' Exhibit C. The FTC regulations require only that the franchisor disclose the "number of franchises that were cancelled or terminated by the franchisor ... during the preceding fiscal year." Plaintiffs' Exhibit A, § 436.1(16)(viii). They also require a general categorization of the reasons for such terminations and the number falling within each category.

In 1981 and 82, Arco withdrew marketing activities from Ohio and portions of four other states. Plaintiffs' Exhibit I, ¶ 37. Arco admits that the UFOC versions provided to plaintiffs do not indicate that any AM/PM franchise had been terminated, cancelled or non-renewed as a result of a lease termination caused by Arco's geographic market withdrawal. *Id*, ¶ 45. Arco disputes that it had any obligation to disclose that five mid-western AM/PM franchises ceased operations in the 1981 market withdrawal because it contends that such franchises were not "cancelled or terminated by the franchisor." Arco asserts that these franchises were ended by mutual agreement reached between the franchisor and franchisees. Arco, however, comes forth with no evidence to support its assertion. In its interrogatory responses, Arco noted that it no longer had files for these facilities and since they were not disclosed as being terminated or cancelled in the UFOC, "they probably were mutually terminated." Plaintiffs' Exhibit H. This self-serving response fails to satisfy Arco's obligation under Rule 56(e), Fed. R.Civ.P., to "set forth specific facts showing that there is a genuine issue for trial." Plaintiffs assert that such franchises were

---

2. Plaintiffs also assert that Arco failed to provide an accurate cross-reference sheet in the UFOC. The cross-reference sheet indicates to the reader where in the narrative portion of the UFOC or in the AM/PM agreement, he or she can find specific clauses regarding a particular subject. Plaintiffs contend that as to conditions under which the company may terminate, the sheet fails to disclose that Arco may terminate the AM/PM franchise agreement in the event of a geographic market withdrawal. As this claim appears duplicative of and adds nothing substantively to plaintiffs' other allegations as to violations of CUTPA, it will not be considered separately.

terminated as a result of market withdrawal and point to the testimony of William Walker, Arco's AM/PM sales manager in Ohio in 1981–82, who stated that "the franchises were cancelled with the premises lease." Plaintiffs' Supplemental Appendix, Exhibit C at 60–64. Arco offers no reasonable justification for its failure to disclose in the AM/PM UFOC, the form chosen by Arco to comply with the FTC's franchise disclosure requirements, the number of franchises terminated due to lease termination as a result of market withdrawal. This is directly contrary to the UFOC's requirement that a franchisor disclose for the relevant period the number of franchises cancelled or terminated by the franchisor and is found to be an unfair trade practice in violation of CUTPA.

■ Finally, plaintiffs argue that Arco's termination of their AM/PM franchises, found to be in breach of the franchise agreements, also constitutes an unfair trade practice in violation of CUTPA. However, such a claim is not found to be within the scope of that alleged in the second count of their third amended complaint. The second count alleges that "[t]he representations, misrepresentations and omissions of Arco within its 'AM–PM' Offering Circular, upon which the plaintiffs reasonably relied, and upon which Arco intended the plaintiffs to rely, were in violation of CUTPA." Third Amended Complaint, ¶ 13. The second count relies solely on inadequacies in the UFOC to assert a violation of CUTPA and nowhere alleges that the termination itself constituted a CUTPA violation. Accordingly, this claim will not be considered as being beyond the allegations of the complaint.

## II. *Damages*

In their trial preparation compliance, plaintiffs assert that damages under CUTPA are properly measured according to a restitution formula whereby the franchisor returns the purchaser to his or her position prior to the purchase. They contend that under this theory they are entitled to a refund of all royalty payments, franchise or assignment fees, and advertising fees paid to Arco from the onset of the franchise relationship with no offset or credit allowed for any benefit allegedly bestowed on plaintiffs. Arco argues that restitution is not the proper measure of actual damages under CUTPA and even if it is a permissible remedy, rescission and restitution is not appropriate in this case as the parties cannot be returned in status quo.

CUTPA provides that "[a]ny person who suffers any *ascertainable loss* of money or property ... as a result of ... a method, act or practice prohibited by section 42–110b, may bring an action ... to recover *actual damages.*" Conn.Gen.Stat. § 42–110g(a) (emphasis added). In *Bailey Employment System, Inc. v. Hahn*, 545 F.Supp. 62, 72–73 (D.Conn.1982), this court, endeavoring to estimate what theory of damages Connecticut's courts would adopt under CUTPA and considering its broad remedial purposes, held that damages under CUTPA "should be measured according to a restitution formula." The Second Circuit approved *Bailey*'s approach to damages under CUTPA with the proviso that "[t]he district court's task was to attempt to return to plaintiff what it lost as a result of defendants' actions" and "the measure used by the court [presumably the restitution theory employed in *Bailey*] was *a reasonable means of achieving this goal.*" *Grand Light & Supply Co. v. Honeywell, Inc.*, 771 F.2d 672, 681 n. 3 (2d Cir.1985). The court did not expressly review the district court's award of damages and remanded on the issue of liability under CUTPA. Nor did it hold that restitution was the only theory of damages permissible.

Subsequent to *Bailey*, the Connecticut Supreme Court held that a plaintiff who seeks "damages under § 42–110g ... [is] bound by the statutory requirement of proof of actual damages." *Conaway v. Prestia*, 191 Conn. 484, 494, 464 A.2d 847 (1983); *see also, Gargano v. Heyman*, 203 Conn. 616, 621, 525 A.2d 1343 (1987) (applying lost profits theory to ascertain damages under CUTPA). In *Conaway*, plaintiff tenants brought a class action alleging that the collection of rent without the requisite certificates of occupancy was in violation of CUTPA. Plaintiffs sought actual

damages and argued that "the appropriate recovery thereof under CUTPA is the return of all rent money collected by the defendants." *Id.* The court rejected plaintiffs' theory of damages and held that plaintiffs "must present sufficient evidence to enable the trier to ascertain with reasonable certainty the diminution of the rental value occasioned by the defendants' wrongful conduct." *Id.* at 495, 464 A.2d 847. The court applied a "benefit of the bargain" theory measuring the difference in value between what was actually received and that which was represented, i.e., an inhabitable apartment. The court also noted that "a 'rent received minus reasonable use and occupancy value' ... [was] a permissible method of determining actual damages." *Id.*

■ Although these cases do not preclude application of a restitution formula to the determination of damages under CUTPA, they affirm the statutory requirement that a CUTPA plaintiff must prove "actual damages" and endorse alternative measures of damages under CUTPA. Arco argues that restitution is inappropriate in this case because of the impossibility of returning the parties to the status quo due to the parties longstanding business relationship. Arco also contends that if this court does award rescission and/or restitution type damages, it is entitled to an offset or credit for all benefits that were conferred on plaintiffs. Under Connecticut law, the remedy of rescission and restitution is simply the unmaking of an agreement, i.e., "a renouncement of the contract and any property obtained pursuant to the contract and places the parties, as nearly as possible, in the same situation as existed just prior to the execution of the contract." *Kavarco v. T.J.E., Inc.*, 2 Conn.App. 294, 299, 478 A.2d 257 (1984). "A condition precedent to rescission is the offer to restore the other party to its former condition as nearly as possible." *Id.*, citing *Duksa v. Middletown*, 192 Conn. 191, 197, 472 A.2d 1 (1984). Rescission is easiest where the parties have exchanged tangible property. *United States v. Texarkana Trawlers*, 846 F.2d 297, 304 (5th Cir.1988). However, where one party transfers intangible property, such as services and proprietary information, the transferee cannot return the property but only its cash value. *Id.* Plaintiffs' claim would benefit, not necessarily restore, them.

■ In exchange for their initial franchise fees ($10,000–15,000), advertising fees, and royalty fees (approximately 11% of gross monthly sales), plaintiffs received numerous goods and services from Arco, including the right to operate under the AM/PM system and service name and use loaned store equipment. Plaintiffs also received a variety of marketing services, such as price and product recommendations, a computerized information support system, store planigram, product development, and advertising and promotional activities. Plaintiffs operated convenience stores under the AM/PM system for approximately one to five years. It would be extremely difficult to unravel each relationship and place a reasonable monetary value on the benefits rendered to plaintiffs by Arco. Further, plaintiffs have a creative view as to rescission, i.e., a return of all moneys paid without any credit or offset allowed to Arco for any benefits bestowed on plaintiffs. Plaintiffs cite no persuasive authority in support of their position. In *Bailey*, the case on which plaintiffs primarily rely, the court held that restitution permitted it to restore "the misled purchaser to his or her status which existed prior to the purchase." 545 F.Supp. at 73. This would presumably involve restoration of any property or benefit received by the plaintiff. Thus the equitable remedy of rescission and restitution is not found to be appropriate under the circumstances to undertake the task of "return[ing] to plaintiff[s] what [they] lost as a result of defendants' actions." *Grand Light & Supply*, 771 F.2d at 681 n. 3. This court is "bound by the statutory requirement of proof of actual damages", *Conaway*, 191 Conn. at 494, 464 A.2d 847, and holds that plaintiffs are entitled to recover the difference between the value of what they actually received and the value of that which was represented in the UFOC, i.e., the diminu-

tion in value caused by Arco's wrongful conduct.[3]

Arco also contends that rescission and restitution is not an appropriate measure of damages for its breach of the AM/PM Mini–Market Agreement found in count three. In their trial preparation order compliance, plaintiffs noted that "[a]s an alternative measure of contract damages, the plaintiffs are entitled to restitution of the amounts paid to the defendants under the terms of their AM/PM franchise agreements" and that if Arco was "permitted to keep the royalty payments paid by the plaintiffs, [Arco] would be unjustly enriched despite their breach of contract." Plaintiffs argue that they restored to defendants' the right to use its trade name and trademark after termination of their franchises and that if they owe anything, it would be in the form of services and intangible items which present a factual matter for the court. However, they contend that an offset or credit should not be provided to Arco, particularly if they can prove fraud, misrepresentation or a CUTPA violation.

As noted with respect to the scope of damages under CUTPA, the facts and circumstances underlying Arco's liability do not warrant an award of restitution without any consideration of the value of the services and other intangibles plaintiffs received from Arco during the term of their franchises. Arco has been held liable for breach of the AM/PM franchise agreement based on the franchise termination and for a CUTPA violation grounded on certain omissions in the UFOC. Plaintiffs argue that Arco induced them to enter into franchise agreements through misrepresentations and omissions and then, in violation of Connecticut franchise law, breached such agreements and abandoned their contracts. They assert that Arco cannot now claim that restitution should not be allowed because they cannot restore to defendants the value of their fraudulently purveyed services. Plaintiffs argument overdramatizes the culpability of defendants' conduct and erroneously minimizes the value of what was conveyed to them. Plaintiffs have never contended that there was any fraud in the services and other intangibles provided under the franchise agreement. Rather they have challenged the propriety of their termination and the adequacy of the disclosures in the UFOC. A review of the record leads this court to conclude that restitution is not an appropriate remedy, plaintiff is free to pursue damages under other contractual damages theories, such as expectancy damages, i.e., placing plaintiffs in as good a position as they would have been had Arco not breached, or reliance damages. *See generally* Dobbs, *Remedies* § 12.1 (1973). Such would presumably include evidence as to plaintiffs' continuation of convenience stores under contracts with Shell and the profitability of such operations.

*Summary*

Plaintiffs' motion for summary judgment on count two alleging a violation of CUTPA is granted as provided herein.[4] Defendants' pretrial motion is also granted to the extent provided herein.

SO ORDERED.

---

**3.** This ruling does not consider, as the issue is not before the court, the propriety of either punitive damages or an award of costs and attorney fees under CUTPA.

**4.** In their request for leave to file the instant summary judgment motion, plaintiffs represented that "[i]n the event the motion for summary judgment were granted, the plaintiffs would be willing to withdraw their fourth count (fraud) since the relief available under CUTPA would be adequate and would obviate the need for a find-

ing on count four." Plaintiffs' Request for Leave at 3. Since plaintiffs' motion for summary judgment was granted on count two, the court will construe plaintiffs' representation as a motion to withdraw under Rule 41(a)(2) and grants such motion. Accordingly, count two is hereby dismissed with prejudice and without costs to either party. Thus it is unnecessary to consider defendants' arguments as to permissible damages under count four or its scope.