GER–RO–MAR, INC., a corporation d/b/a Symbra'Ette, and Carl G. Simonsen, Individually and as President of Ger-Ro-Mar, Inc., Petitioners,

v.

FEDERAL TRADE COMMISSION, Respondent.

No. 1066, Docket 74–2343.

United States Court of Appeals, Second Circuit.

Argued May 19, 1975.

Decided June 16, 1975.

Jack M. Wiseman, San Jose, Cal. (Clifton H. Stannage, New York City, of counsel), for petitioners.

W. Baldwin Ogden, Atty., Federal Trade Commission, Washington, D.C. (Calvin J. Collier, Gen. Counsel, Gerald Harwood, Asst. Gen. Counsel), for respondent.

Before MULLIGAN, TIMBERS and GURFEIN, Circuit Judges.

MULLIGAN, Circuit Judge:

This is a petition to review a cease and desist order issued by the Federal Trade

Commission against Ger-Ro-Mar, Inc., a California corporation doing business as Symbra'Ette, Inc., and Carl G. Simonsen, individually and as President of the said corporation.

Petitioners operate a family business which was organized in 1963 and is engaged in the manufacture and sale of brassieres, girdles, swimwear and lingerie. Its sales have grown from $36,832.91 in 1965 to $2,054,250.62 in 1969 but dropped to $1,195,465.75 in 1972. The FTC issued a complaint on November 24, 1971 which alleged that the petitioners' marketing system constituted unfair and deceptive acts and practices and unfair methods of competition in violation of section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45.[1] The FTC complaint contained five counts. Count I charged that the petitioners' merchandising program was in the nature of a lottery; Count II charged that the program, which depended upon the ability of distributors to recruit others, was an unfair method of competition as well as an unfair and deceptive act and practice in commerce; Count III charged that the representations and promotional materials of the petitioners were false, misleading and deceptive; Count IV charged unlawful vertical price fixing; and Count V claimed unlawful restrictions upon distributor resales.

After an answer and a hearing an administrative law judge rendered an Initial Decision dated October 11, 1973 which upheld the charges of violations contained in all five counts. The Commission on July 23, 1974 issued a Final Order and Opinion which reversed the administrative judge on the lottery count (Count I) and affirmed him on all the other counts. A motion for reconsidera-tion filed by petitioners was denied by the Commission on October 1, 1974. This petition for review followed.

## I

Since the Count I violation (lottery) was reversed below, that issue is not before us. Although the petitioners seek to have the order set aside in its entirety, no serious argument is made with respect to those parts of the Commission's order which require them to cease and desist from vertical price fixing (except in states having Fair Trade Laws) and from enforcing customer restrictions upon reselling. Petitioners have in any event agreed to discontinue such practices. Hence paragraphs 9, 10 and 11 of the Commission's order to cease and desist, which relate to these violations, are affirmed and enforced.

## II

Before reaching the substance of this petition we should dispose of a major contention of the petitioners, namely, that the order be set aside because the Commission has acted arbitrarily and capriciously in taking action against them while taking none against their direct competitors who utilize comparable selling plans. Paragraph 10 of the Stipulation of Facts dated March 16, 1973 states:

There are competitors of Symbra'ette selling brassieres, girdles, swim-wear and lingerie under similar marketing and sales programs. As of March 16, 1973, the Federal Trade Commission has instituted no formal proceedings against any of these competitors on the issues raised by the present complaint.

---

1. "(a)(1) Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are declared unlawful.

. . . . .

"(6) The Commission is empowered and directed to prevent persons, partnerships, or corporations, except banks, common carriers subject to the Acts to regulate commerce, air carriers and foreign air carriers subject to the Federal Aviation Act of 1958, and persons, partnerships, or corporations insofar as they are subject to the Packers and Stockyards Act, 1921, as amended, except as provided in section 406(b) of said Act, from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce."

Petitioners argue that the FTC action against them, while leaving their competitors unscathed, is in direct conflict with the holding of this court in *Marco Sales Company* v. *FTC*, 453 F.2d 1 (2d Cir. 1971). We disagree. In *Marco,* the Commission had proceeded capriciously not because it had taken no action against others charged with utilizing the same selling device (punch boards), but rather because it had previously instituted a rule-making procedure which regulated the use of punch boards in the food retail and gasoline industries; that is, the Commission did not abolish punch board gambling in those industries, it was content merely to regulate. However, it proceeded by adjudicatory procedures against Marco Sales and the order under review prohibited the use of punch boards by Marco without condition. In sum, while others were regulated, Marco was annihilated. This we deemed to constitute an abuse of agency discretion. The situation here is distinguishable. The Commission has not given its blessings to Symbra'Ette competitors while condemning Symbra'Ette. It has not yet proceeded against others and an affirmance of this order might well trigger agency action against comparable selling plans. In *Marco,* we noted specifically that "[o]bviously, the Commission cannot be expected to bring simultaneous proceedings against all of those engaged in identical practices". 453 F.2d at 6. That proposition is well established. *FTC* v. *Universal-Rundle Corp.,* 387 U.S. 244, 251, 87 S.Ct. 1622, 18 L.Ed.2d 749 (1967); *Moog Industries, Inc.* v. *FTC,* 355 U.S. 411, 413, 78 S.Ct. 377, 2 L.Ed.2d 370 (1958). We conclude that while petitioners may be unfortunate in being the first target of the Commission with respect to the selling practices in question, the Commission is under no obligation to start simultaneous suits against all alleged offenders and it did not abuse its discretion in any sense under the *Marco* holding.

### III

The substantial questions before us are whether or not the Symbra'Ette merchandising scheme is an unfair method of competition and an unfair and deceptive practice, and the related question of whether or not petitioners' promotion of the plan was inherently deceptive. It is necessary at the outset to note that March 16, 1973 Stipulation of Facts (Para. 9) stated:

> There is no contention that any deception, fraud, unethical practice, misrepresentation, or improper conduct is present in the presentation of the products or their prices to customers.

Therefore, according to the theory of the FTC complaint, it is not the purchaser, actual or prospective, of Symbra'Ette garments who is being gulled or put upon but rather the prospective distributor and his recruits. Since the Symbra'Ette merchandising scheme is elaborate, we must set it forth, unfortunately in some detail, to understand the Commission's misgivings.

### The Marketing Plan

Petitioners, through their multi-level marketing program, seek to enlist the services of men and women throughout the country to sell their products at wholesale and retail, requiring distributors to buy an inventory of varying size before they may participate in the program. A potential distributor (also called a "consultant") may enter at one of three levels ("Key Distributor," "Senior Key," or "Supervisor"), and eventually work up to a fourth and fifth level (District Manager and Regional Manager). Entry into the program is effected by means of a non-refundable purchase of merchandise from the company or one of its distributors. All distributors except the lowest (Key) purchase directly from the company; a Key Distributor purchases from his sponsor. Initial purchase requirements for entry into the program are stated in terms of "Retail Purchase Volume" (RPV), i. e., the volume of merchandise expressed in terms of its suggested retail price. The initial purchase requirement for entry into the program is $300 in RPV for a Key, which at the allowed discount of 35%

amounts to an initial purchase requirement of around $215.

The initial RPV required for a Senior Key is $1,000, which, at the allowed discount of 40%, and including literature and sales aids, entails an initial purchase of around $700. The initial purchase required of a Supervisor is around $1,950, resulting from a $3,000 RPV requirement at a 45% discount, plus sales aids.

A Key Distributor may engage in unlimited recruiting of other distributors, and advance to the level of Senior Key if his retail purchase volume and that of his recruits amount to $1,000 in one calendar month. Similarly, Senior Keys and Supervisors may rise to higher levels by achieving the requisite Retail Purchase Volume, through a combination of their own retail sales and those of their "personal group" (their recruits and recruits' recruits).

A Key Distributor's profit is the difference between the prices paid the Key's sponsor for products, and the prices at which the Key resells. The profit for consultants at higher levels in the program consists of the margin on the consultant's own retail sales, a percentage profit on purchases made by his recruits, and various commissions, overrides, and other compensation related to the purchase volume of directly and indirectly sponsored consultants.

To induce individuals to become consultants, petitioners distributed various promotional materials which recited the details of the marketing system, and illustrated, how, both by building a large personal group of salespeople via recruitment, and by selling at retail, an individual could earn large sums of money, ranging in the illustrations up to $56,400 per year for District Managers and $90,600 yearly for Regional Managers. Of the Regional Manager position, petitioners' promotional "flip chart" promised "ANYONE CAN ACHIEVE THIS LEVEL." According to the Commission, individuals were induced by these promotional materials, and the prospect of earning large amounts of money via retailing and recruiting activities, to purchase the requisite volume of Symbra'Ette products for the level at which they wished to enter.

## IV

The marketing plan thus described is characterized by the Commission as inherently unfair and deceptive because it had "the substantial tendency, capacity, and potential to mislead." It supposedly caused participants to invest their money in the hope of realizing income which was impossible for all to achieve: the laws of geometrical progression would make it impossible to recruit continually since inevitably a point of saturation would be reached which would defeat the plan and thwart the ambitions of those who had been promised profits.

It is unquestioned that under its own rules (Rule 3.43(a), Rules of Practice of the Federal Trade Commission, 16 C.F.R. § 3.43(a) (1974)) and pertinent cases (e. g., *Montgomery Ward & Co.* v. *FTC*, 379 F.2d 666, 670 (7th Cir. 1967); *Carter Products, Inc.* v. *FTC*, 268 F.2d 461, 487 (9th Cir.), cert. denied, 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959)), the Commission has the burden of establishing a section 5 violation. Petitioners urge that there is no showing of any actual deception or actual injury. The only witness produced by the Commission did not testify that he was misled or deceived and in fact testified that he and his wife had profited by the distributorship.[2] However, it is settled that the Commission need not show actual deception or actual damage; rather, a business method having only the *capacity* to deceive can violate section 5. E. g., *FTC* v. *Algoma Lumber Co.*, 291 U.S. 67, 81, 54 S.Ct. 315, 78 L.Ed. 655 (1934);

---

**2.** The Commission's witness testified that, during the first year of their Symbra'Ette business, his wife's profit on the sale of merchandise to ultimate consumers was approximately $1,500; he did so well he reordered petitioners' merchandise over 50 times, although much of their merchandise was sold to recruits.

*Charles of the Ritz Distributors Corp.* v. *FTC,* 143 F.2d 676, 680 (2d Cir. 1944). The theory upon which the Commission proceeds, then, is that the plan had the capacity and potential for deception. The question before us becomes whether or not the finding of potential deception is supported by substantial evidence in the record. See *Universal Camera Corp.* v. *N.L.R.B.,* 340 U.S. 474, 487–88, 71 S.Ct. 456, 95 L.Ed. 456 (1951); cf. *FTC* v. *Colgate-Palmolive Co.,* 380 U.S. 374, 385, 85 S.Ct. 1035, 13 L.Ed.2d 306 (1965).

The sole evidence to support the Commission's holding that the plan is inherently unfair and deceptive is a mathematical formula,[3] which shows that if each participant in the plan recruited only five new recruits each month and each of those in turn recruited five additional recruits in the following month, and this process were allowed to continue, at the end of only 12 months the number of participants would exceed 244 million, including presumably the entire staff of the FTC. The Commission concludes that this, in effect, is the impossible dream and that the siren song of Symbra'Ette must be stilled. We find no flaw in the mathematics or the extrapolation and agree that the prospect of a quarter of a billion brassiere and girdle hawkers is not only impossible but frightening to contemplate, particularly since it is in excess of the present population of the Nation, only about half of whom hopefully are prospective lingerie consumers. However, we live in a real world and not fantasyland.

As indicated by the record, the fact is that Symbra'Ette, which commenced business in 1963, did not reach its peak in distributorships until 1972 when it had attracted some 3,635 distributors. The record does not indicate the geographical distribution of these vendors, and we have no study or analysis in the record which would realistically establish that some recruiting saturation exists which would make the entry of additional distributors and the recruitment of others potentially impossible in any practical sense. While the Commission need not establish actual deception by the testimony of disappointed entrepreneurs, it has failed entirely to establish a potential threat. Not all Americans aspire to the calling in issue and not all who are attracted will continue indefinitely.[4]

■ The cases relied upon by the Commission to establish that potential injury is sufficient to constitute a section 5 violation involve false advertising claims where the Commission has established by evidence that the claims made in the material *are* false and hence the courts have not required proof of actual deception.[5] Even then the courts have

---

3. For the mathematically curious, the formula for calculating the number of participants at any level "n" is $n = x^i$, where "x" is the number of recruits per participant per level, and "i" is the level. Because of the exponential function, the number of recruits would, in theory at least, expand quite rapidly. For example, to use the Commission's hypothetical figures of 5 for x (the number of recruits per participant per level) and 12 for i (the number of levels), the formula becomes $n = 5^{12}$, or 244,140,625.

4. For example, a Dr. Dirk Wassenaar, a witness for petitioners, testified on cross-examination that "in practice . . . distributors go into this for a while and they get tired of it or they find greener pastures or they get pregnant or they get married or they get transferred and they give up this particular kind of program. So you have to consider a drop-out rate. . . . So as the company grows, the number of people that will join the company will become smaller, the number of people dropping will probably increase and this thing will balance out to some kind of an equilibrium."

5. For example, in *FTC* v. *Algoma Lumber Co.,* 291 U.S. 67, 54 S.Ct. 315, 78 L.Ed. 655 (1934), "Western Yellow Pine" was sold under the trade name of "California White Pine," though it was in fact inferior to true white pine lumber; furthermore, the Court found that the misleading trade name caused confusion among consumers. In *Montgomery Ward & Co.* v. *FTC,* 379 F.2d 666 (7th Cir. 1967), the Commission attacked advertising which represented that merchandise was guaranteed without specifying the nature and extent of the guarantees; in fact, there was a deviation between the advertised and actual guarantees since the latter were subject to limitations and conditions not revealed in the advertisements.

often not talked about a theoretical possibility but rather, as Judge Kaufman noted in *FTC* v. *Sterling Drug, Inc.,* 317 F.2d 669, 674 (2d Cir. 1963), the situation where "the representations made have a capacity or tendency to deceive, i. e., when there is a. *likelihood* or *fair probability* that the reader will be misled" (emphasis added). Here there is no showing at all that even the most credulous prospective distributor was likely or probably gulled by the plan discussed. The validity of the rule of mathematical progression must, in our view, not be considered *in vacuo* but must be put in the context of actual competitive conditions, see *Columbia Broadcasting System, Inc.* v. *FTC,* 414 F.2d 974, 978 (7th Cir. 1969), cert. denied, 397 U.S. 907, 90 S.Ct. 903, 25 L.Ed.2d 88 (1970); *Korber Hats, Inc.* v. *FTC,* 311 F.2d 358, 360–61 (1st Cir. 1962); *Ford Motor Co.* v. *FTC,* 120 F.2d 175, 181 (6th Cir.), cert. denied, 314 U.S. 668, 62 S.Ct. 130, 86 L.Ed. 535 (1941), where whatever expertise the Commission may have in determining possible adverse competitive injury or consumer deception will weigh heavily with us. However, here it has relied solely upon an abstract mathematical theorem without any attempt to relate the theory to the marketplace. The Commission has made no study, offered no analysis and has no greater familiarity with the law of geometric progression than the court. It is for the courts eventually and not the Commission to determine what unfair competition is. *FTC* v. *Beech-Nut Packing Co.,* 257 U.S. 441, 453, 42 S.Ct. 150, 66 L.Ed. 307 (1922).

The per se condemnation of the recruiting scheme disclosed here is not supported by substantial evidence or even a scintilla. Cf. *Callaghan & Co.* v. *FTC,* 163 F.2d 359, 372 (2d Cir. 1947). Hence, we vacate and set aside paragraphs 1 and 2 of the trial order of the Commission.[6]

## V

It does not follow of course that the failure of the Commission to establish that the plan in question is violative of section 5 means that the petitioners are free to advertise it in their promotional literature in deceptive terms. Here, the Commission did rely upon sales manuals and other specific representations made by the petitioners that ascension up the marketing ladder was rapid,

This circuit, in denying a temporary injunction in *FTC* v. *Sterling Drug, Inc.,* 317 F.2d 669 (2d Cir. 1963), ruled that the Commission *failed* to show it had reason to believe that the public would be misled by advertising concerning the results of a medical study on pain relievers. In *Charles of the Ritz Distrib. Corp.* v. *FTC,* 143 F.2d 676 (2d Cir. 1944), the Commission found that the petitioner's "Rejuvenescence Cream" and its accompanying advertising falsely represented that the product would rejuvenate and restore the appearance of youth to the skin, whereas in fact such was a medical impossibility. Finally, in *Ford Motor Co.* v. *FTC,* 120 F.2d 175 (6th Cir.), cert. denied, 314 U.S. 668, 62 S.Ct. 130, 86 L.Ed. 535 (1941), petitioner's advertisement of a "6%" plan to finance sales of its cars was found to be misleading on its face because no description was given of the actual financing practice, which did not calculate interest on a declining balance and hence really produced a simple annual interest rate of 11½%.

**6.** "1. Offering, operating, or participating in, directly or indirectly, any marketing or sales plan or program wherein a participant gives a valuable consideration in return for the opportunity to receive compensation for inducing other persons to become participants in the plan or program; provided that "compensation" as used in this paragraph only does not mean any payment based on actually consummated sales of goods or services to persons who are not participants in the plan or program, and who do not purchase goods or services in order to participate in the plan or program.

"2. Offering, operating, or participating in, directly or indirectly, any marketing or sales plan or program wherein the financial gains to participants are, or are represented to be, based in any manner or to any degree upon their recruiting of other participants who obtain the right under the plan or program to recruit yet other participants, whose function during their first year in the plan or program includes, in any respect whatsoever, the recruitment of participants."

that all had the potential of making large profits and that the supply of available participants was inexhaustible. There is sufficient evidence in the record to support the finding that these *claims* were deceptive. In *FTC* v. *Colgate-Palmolive Co., supra,* 380 U.S. at 385, 85 S.Ct. 1035, we are told that the Commission's judgment with respect to allegedly deceptive advertising is to be given great weight. We further note that the petitioners, in their reply brief, have conceded that "[I]f there be any questionable conduct on the part of Symbra'Ette, it must be in the alleged misrepresentations in its advertising. The ends of justice will be met and any misconduct will be obviated by merely prohibiting misrepresentations in the advertising." We are inclined to agree and affirm and enforce paragraphs 3, 4, 5, 6, 7 and 8 of the final order.[7]

The order is modified by the deletion of paragraphs 1 and 2, and is enforced as modified.

7. "3. Operating any marketing or sales plan or program unless respondents agree to and notify participants that they will promptly repurchase all or any part of any initial order of merchandise made by any participant, upon written request of the participant mailed within 30 days (or a greater period of time if respondents elect) of the receipt of the initial order by the participant, at the price actually paid by the participant for the merchandise, provided, however, that respondents may insist that prior to making repurchase, the merchandise be returned to respondents' place of business, postage or shipping prepaid, in a resaleable condition, said merchandise to be shipped within 30 days (or a greater period of time if respondents elect) of the date on which written request for repurchase is received.

"4. Representing, directly or by implication, or by use of hypothetical examples or representations of past earnings of participants, that participants in any marketing or sales program will earn or receive, or have the reasonable expectancy of earning or receiving, any stated gross or net amounts, unless in fact, a majority of participants in the community or geographic area in which such representations are made, have achieved the stated gross or net amounts represented, and the representations accurately reflect the amount of time required by such participants to achieve such gross or net amounts.

"5. Misrepresenting in any manner, directly or by implication, or placing in the hands of others the means or instrumentalities for misrepresenting, the financial gains reasonably achievable by participants in any marketing or sales plan or program, of the commercial feasibility thereof.

"6. Failing to maintain adequate records (a) which disclose the facts upon which any claims of the type discussed in paragraphs 4 and 5 of this Order are based; and (b) from which the validity of any claim of the type discussed in paragraphs 4 and 5 of this Order can be determined.

"7. Requiring that an individual pay a valuable consideration in return for the right to participate in any marketing or sales program, without first disclosing to such prospective participant in writing the number of other participants in the marketing area in which such prospect plans to operate."

We note that paragraph 3 does not involve misrepresentation but rather imposes a repurchase obligation upon the petitioners. Since they indicated on the argument of this appeal that they have instituted this practice, there is no existing dispute about the matter.