**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| FEDERAL TRADE COMMISSION, *Plaintiff-Appellee*, <br><br> v. <br><br> BURNLOUNGE, INC., a Corporation; JUAN ALEXANDER ARNOLD, an individual, *Defendants-Appellants*, <br><br> and <br><br> JOHN TAYLOR, an individual; ROB DEBOER, an individual, *Defendants*. | No. 12-55926 <br><br> D.C. No. 2:07-cv-03654-GW-FMO |

| | |
|---|---|
| FEDERAL TRADE COMMISSION, *Plaintiff-Appellee*, <br><br> v. <br><br> BURNLOUNGE, INC., a Corporation; JUAN ALEXANDER ARNOLD, an individual, ROB DEBOER, an individual, *Defendants*, | No. 12-56197 <br><br> D.C. No. 2:07-cv-03654-GW-FMO |

and

John Taylor, an individual,
                    *Defendant-Appellant.*

---

Federal Trade Commission,
                    *Plaintiff-Appellant*,

v.

Rob DeBoer, an individual,
                    *Defendant-Appellee*,

and

John Taylor, an individual,
                    *Defendant*,

BurnLounge, Inc., a Corporation;
Juan Alexander Arnold, an
individual,
                    *Defendants*.

No. 12-56228

D.C. No.
2:07-cv-03654-
GW-FMO

OPINION

Appeal from the United States District Court
for the Central District of California
George H. Wu, District Judge, Presiding

Argued and Submitted
December 6, 2013—Pasadena, California

Filed June 2, 2014

Before:  Harry Pregerson, Marsha S. Berzon,
and Morgan Christen, Circuit Judges.

Opinion by Judge Christen

**SUMMARY**[*]

**Federal Trade Commission**

The panel affirmed the district court's order granting a permanent injunction against BurnLounge, Inc.'s continued operation based on the court's holding that BurnLounge's multi-level marketing business was an illegal pyramid scheme in violation of § 5(a) of the Federal Trade Commission Act.

BurnLounge operated a multi-level marketing business that offered participants the ability to become "Independent Retailers" of music and other merchandise.  Independent Retailers could earn points redeemable for music or merchandise, or they could pay an additional fee to become "Moguls" and earn cash rewards.

The panel held that BurnLounge's scheme satisfied both prongs of the *Webster v. Omnitron International, Inc.*, 79 F.3d 776 (9th Cir. 1996), pyramid scheme test because Moguls paid for the right to sell products, the rewards BurnLounge paid were primarily for recruitment, and Moguls were clearly motivated by the opportunity to earn cash

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

rewards from recruitment. The panel also held that the district court did not abuse its discretion in admitting the Federal Trade Commission's expert testimony because the testimony was relevant and reliable.

## COUNSEL

Lawrence B. Steinberg (argued) and Efrat M. Cogan, Buchalter Nemer, P.C., Los Angeles, California, for Defendants-Appellants BurnLounge, Inc. and Juan Alexander Arnold.

W. James Jonas III, W. James Jonas III, P.C., San Antonio, Texas, for Defendant-Appellant John Taylor.

No appearance for Defendant/Cross-Appellee Rob DeBoer.

Burke W. Kappler (argued), Attorney; John F. Daly, Deputy General Counsel for Litigation; and David C. Shonka, Acting General Counsel, Federal Trade Commission, Washington, D.C.; Chris M. Couillou and Dama J. Brown, Federal Trade Commission, Atlanta, Georgia, for Plaintiff-Appellee/Cross-Appellant Federal Trade Commission.

M. Jeffrey Hanscom and Joseph Mariano, Direct Selling Association, Washington, D.C.; Deborah T. Ashford, Philip C. Larson, and Catherine E. Stetson, Hogan Lovells US LLP, Washington, D.C., for Amicus Curiae Direct Selling Association.

**OPINION**

CHRISTEN, Circuit Judge:

BurnLounge, Inc. operated a multi-level marketing business that offered participants the ability to become "Independent Retailers" of music and other merchandise. Independent Retailers could earn points redeemable for music or merchandise, or they could pay an additional fee to become "Moguls" and earn cash rewards. The Federal Trade Commission filed suit against BurnLounge alleging violation of § 5(a) of the Federal Trade Commission Act (FTCA). Section 5(a) states: "unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful." 15 U.S.C. § 45(a)(1). The operation of a pyramid scheme constitutes an unfair or deceptive act or practice in or affecting commerce for the purposes of § 5(a). *See In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1178, 1181 (1975).

BurnLounge, Juan Alexander Arnold (CEO and creator of BurnLounge), and John Taylor (participant in the BurnLounge scheme) appeal the district court's order granting a permanent injunction against BurnLounge's continued operation based on the court's finding that BurnLounge was an illegal pyramid scheme. BurnLounge and Arnold also appeal the district court's denial of their motion to exclude the testimony of Dr. Peter Vander Nat, the FTC's expert. We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. We agree with the district court that BurnLounge was an illegal pyramid scheme in violation of the FTCA because BurnLounge's focus was recruitment, and because the rewards it paid in the form of cash bonuses were tied to recruitment rather than the sale of merchandise. We

also hold that the district court did not abuse its discretion by admitting Vander Nat's testimony because his testimony was relevant and reliable. Accordingly, we affirm on these issues. We discuss the district court's consumer harm calculation and the FTC's cross-appeal in a separate memorandum disposition.

## I. BACKGROUND

BurnLounge operated from 2005 to 2007 and sold music, music-related merchandise, and packages of music-related merchandise. Customers could participate in BurnLounge in three ways: they could buy music and merchandise; they could buy a package to become an Independent Retailer with the ability to earn credits redeemable for music and merchandise; or they could buy a package and pay an additional fee to become a Mogul with the ability to earn credits redeemable for cash. In 2007, the FTC commenced this action and the parties stipulated to a preliminary injunction that prohibited BurnLounge from continuing to operate its Mogul program. After a bench trial, the district court concluded that BurnLounge and the individual defendants had violated FTCA § 5(a), issued a permanent injunction, and imposed monetary awards against the defendants.

## A. BurnLounge's Business

### 1. The basics of BurnLounge

The evidence at trial showed that BurnLounge's business had two primary aspects—its Retailer program and its Mogul program. Individuals could become Independent Retailers of online music by purchasing one of BurnLounge's three

packages: Basic ($29.95 per year); Exclusive ($129.95 per year plus $8 per month); or VIP ($429.95 per year plus $8 per month). Each package provided the Retailers with access to a ready made and customizable web page, called a "BurnPage."[1] A BurnPage was the vehicle through which Retailers sold music, music-related merchandise, or packages of music-related merchandise to customers in return for "BurnRewards." More expensive packages included more merchandise for personal use by the Retailer.[2] Individuals who participated as Retailers could redeem BurnRewards for music or merchandise.

Retailers could pay an additional monthly fee of $6.95 to become Moguls. Once qualified, Moguls could redeem BurnRewards for cash rather than music or merchandise.[3] The Mogul program was the only aspect of BurnLounge that the district court found to be a pyramid; accordingly, this opinion focuses on the Mogul program.

---

[1] These web pages were technically called "BurnLounges," but the district court called them "BurnPages" to avoid confusion. We follow that convention.

[2] For example, the Basic package included a sample copy of BurnLounge Magazine and an annual subscription to BurnLounge's online publication; the Exclusive package added a monthly DVD and other merchandise; and the VIP package added an event pass and the BurnLounge University DVD set.

[3] In addition to buying a package and paying the monthly Mogul fee, to become qualified to redeem BurnRewards for cash a Mogul had to: (1) sell two Exclusive or VIP product packages; (2) sell two music albums to non-Moguls; and (3) on a continuing basis, have sold at least two albums to non-Moguls in the previous month.

### 2.  BurnLounge bonuses

BurnLounge offered Moguls the opportunity to earn three types of BurnRewards bonuses that could be redeemed for cash.  Each type of bonus had a separate set of requirements that had to be met before Moguls were eligible to receive the bonus.

### a.  Concentric Retail Bonuses

Moguls received "Concentric Retail Bonuses" for music, merchandise, and package sales made through their own BurnPage and through the BurnPages of their downline recruits.  Downline recruits included participants recruited by Moguls and those recruited by earlier recruits.  This sequence created a hierarchy, with those whom a Mogul directly recruited in the first "Ring" of the hierarchy, those whom the recruits recruited in the second Ring of the hierarchy, and so on, for up to six Rings.  To qualify for a Concentric Retail Bonus for sales made by recruits in each Ring of the hierarchy, a Mogul had to sell at least the number of packages corresponding to that Ring number.  For example, to qualify for Concentric Retail Bonuses for sales made by recruits in the fourth Ring, a Mougl had to sell at least four packages.  The Mogul also had to have made a certain number of music album sales in the previous month, and the Mogul's hierarchy must have made a certain number of album sales in the previous month.

### b.  Product Package Bonuses

Moguls received "Product Package Bonuses" for selling product packages.    Moguls received these bonuses in increasing amounts for the sale of Basic, Exclusive, and VIP

packages ($10, $20, and $50 respectively). To qualify for this bonus, Moguls must have sold at least two music albums to non-Moguls in the previous month and have a positive BurnRewards account.[4]

### c. Mogul Team Bonuses

Moguls earned "Mogul Team Bonuses" by accruing "Mogul Team Points." Mogul Team Points were accrued by selling premium packages (Exclusive or VIP). Once a Mogul accrued enough Mogul Team Points, the points were automatically converted into a Mogul Team Bonus paid in BurnRewards, which could be converted to cash. The amount of cash earned for each Mogul Team Bonus depended on the type of package the Moguls originally purchased and the amount of music the Moguls sold. A VIP Mogul, who paid the $429.95 yearly fee, could earn a $50 bonus with no additional music sales. An Executive Mogul, who paid the $129.95 yearly fee, could earn a $25 bonus, or a $50 bonus if that Mogul also sold $500 worth of music. A Basic Mogul, who paid the $29.95 yearly fee, was not eligible for a Mogul Team Bonus unless that Mogul sold $500 worth of music (for a $25 bonus) or $1,000 worth of music (for a $50 bonus).[5]

---

[4] All Retailers and Moguls had BurnRewards accounts, which were like bank accounts for the BurnRewards they earned or purchased with a credit card.

[5] BurnLounge argues on appeal that the district court did not take into account the fact that, in 2006, it made a major policy change to the sales requirements for receiving bonuses. BurnLounge failed to raise this issue until its Rule 59 motion. The district court rejected it because BurnLounge could have raised the issue at trial. Even though this issue was not fully litigated in the district court, we have considered it and conclude that it does not change our analysis.

## B.  District Court Proceedings

After a bench trial, the district court issued a statement of decision.    It provides a comprehensive review of BurnLounge's merchandise, bonus system, and advertising materials.  The district court described BurnLounge's bonus system as "a labyrinth of obfuscation."  It found there was a 93.84% failure rate for all Moguls, meaning 93.84% of Moguls never recouped their investment.  The district court also found that BurnLounge's marketing focus was on recruiting new participants through the sale of packages.  The district court ruled that BurnLounge's expert, David Nolte, provided estimated values of the merchandise in the BurnLounge packages that were not credible or supported by the evidence.  It found that BurnLounge's products had some value, but concluded that the evidence did not support a finding that the products were worth what was charged for them.

The district court found that because purchasing a package was required for participation as a Retailer or Mogul, and because Moguls earned cash for selling packages, "[Moguls] by default received compensation for recruiting others into the program."  The district court concluded that "a majority of the BurnLounge business (consisting of the Mogul program and related elements) was a pyramid scheme."

## II.  STANDARD OF REVIEW

We review a district court's findings of fact after a bench trial for clear error.  *See* Fed. R. Civ. P. 52(a)(6); *Allen v. Iranon*, 283 F.3d 1070, 1076 (9th Cir. 2002).  Under this deferential standard "we will accept the [district] court's

findings of fact unless we are left with the definite and firm conviction that a mistake has been committed." *Allen*, 283 F.3d at 1076. We review the district court's conclusions of law de novo. *FTC v. Garvey*, 383 F.3d 891, 900 (9th Cir. 2004). We review the district court's decision to admit expert testimony for abuse of discretion. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997).

## III.  DISCUSSION

In *Webster v. Omnitrition International, Inc.*, our court approved the FTC's test for determining whether a multi-level marketing (MLM) business is a pyramid scheme: a pyramid scheme is "characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product *and* (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users." 79 F.3d 776, 781 (9th Cir. 1996) (quoting *Koscot*, 86 F.T.C. at 1180). Not all MLM businesses are illegal pyramid schemes. To determine whether a MLM business is a pyramid, a court must look at how the MLM business operates in practice. *See id.* at 783–84; *see also United States v. Gold Unlimited, Inc.*, 177 F.3d 472, 479–82 (6th Cir. 1999); *In re Amway Corp.*, 93 F.T.C. 618, 716 (1979).

## A.  Prong 1: Participants in the BurnLounge business paid money in return for the right to sell a product.

Moguls were required to purchase a package (Basic, Exclusive, or VIP) in order to access a BurnPage. BurnPages provided Moguls with the ability to sell music, merchandise, and packages. The sale of packages thus conveyed "the right

to sell a product," which satisfies the first prong of *Omnitrition*. 79 F.3d at 781 (citation omitted).

## B. Prong 2: BurnLounge participants paid money in return for the right to receive rewards for recruiting other participants into the program, which were unrelated to the sale of the product to ultimate users.

Satisfaction of the second prong of the *Omnitrition* test is "the *sine qua non* of a pyramid scheme" and is characterized by "recruitment with rewards unrelated to product sales." *Id.* at 781. In *Omnitrition*, this court found that a MLM business was a pyramid scheme because "[t]he mere structure of the scheme suggests that Omnitrition's focus was in promoting *the program* rather than selling *the products*." *Id.* at 782 (emphases in original). The FTC has explained that in a pyramid, "participants purchase the right to earn profits by recruiting other participants, who themselves are interested in recruitment fees rather than the sale of products." *Amway*, 93 F.T.C. at 716–17.

Here, the FTC presented ample evidence to support the district court's finding that BurnLounge was an illegal pyramid scheme. It did so by showing that: (1) Moguls were required to recruit new members in order to become eligible for all three types of cash bonuses and (2) Moguls were motivated by the opportunity to earn cash rewards, as shown by data illustrating the sharp difference in package purchasing patterns of Moguls and non-Moguls, and by the fact that BurnLounge's sales plummeted after the Mogul program was enjoined.

We agree with the district court that the FTC provided sufficient evidence to prove that BurnLounge's focus was

recruitment and that the rewards it paid, in the form of cash bonuses, were primarily for recruitment rather than for sales of merchandise. Recruiting was built into the compensation structure in that recruiting led to eligibility for cash rewards, and more recruiting led to higher rewards. For example, Moguls could not convert their rewards to cash until they became qualified Moguls, and Moguls had to sell two premium packages to become qualified. Selling packages was a way of recruiting new Moguls—in fact, it was the only form of recruitment—because purchasing a package was necessary to become a Mogul and earn cash rewards. Also, 96.8% of the participants who bought packages became Moguls, which is strong evidence that package purchases were motivated by the opportunity to earn cash.

Moguls were required to sell packages to receive Concentric Retail Bonuses at each level of their downline hierarchy. Product Package Bonuses were cash rewards received for selling packages to new members. Moguls received more lucrative bonuses if they sold premium packages. Moguls were also eligible to receive Mogul Team Points, with the goal of receiving Mogul Team Bonuses, by selling packages to new participants. The district court found that Mogul Team Bonuses were "[t]he most lucrative." This finding is supported by the record: in 2006, BurnLounge paid a total of $2,726,965.50 in Concentric Retail Bonuses and four times that amount, nearly $8,480,975.00, in Mogul Team Bonuses. Concentric Retail Bonuses were paid for the sale of music and packages (though the bonus was based on only a percentage of the first $29.95 of each package). In contrast, Mogul Team Points accrued only for the sale of packages, so they primarily rewarded recruiting new participants. The fact that BurnLounge paid approximately four times more in Mogul Team Bonuses than Concentric Retail Bonuses

supports the district court's finding that Moguls had a strong incentive to recruit new participants. This incentive was the danger our court warned of in *Omnitrition*, where we stated, "The promise of lucrative rewards for recruiting others tends to induce participants to focus on the recruitment side of the business at the expense of their retail marketing efforts, making it unlikely that meaningful opportunities for retail sales will occur." *Omnitrition*, 79 F.3d at 782 (citing *Koscot*, 86 F.T.C. at 1181).

That BurnLounge motivated Moguls through cash rewards earned by recruiting other participants is exemplified by the sharp difference between Moguls' and non-Moguls' package purchase patterns. BurnLounge's own data showed that 67% of Moguls bought VIP packages, 28.8% bought Exclusive packages, and just 4.2% bought Basic packages. In contrast, 17.3% of non-Moguls bought VIP packages, 17.2% bought Exclusive packages, and 65.5% bought Basic packages. If package purchases were driven by the value of the merchandise included in the packages rather than by the opportunity to earn cash rewards, one would expect to see comparable numbers of Moguls and non-Moguls buying the same packages. Further, 96.6% of non-Moguls (56,017 people) did not purchase any of the packages at any time—they just bought music and other merchandise.

The district court's finding that BurnLounge paid rewards for recruitment unrelated to product sales is also supported by the effect the preliminary injunction had on BurnLounge's revenues. After the parties entered into a stipulated preliminary injunction in July 2007 that stopped BurnLounge from offering the ability to earn cash rewards, BurnLounge's revenues plummeted. BurnLounge still offered packages, but its revenues decreased from $476,516 in June 2007 to

$10,880 in August 2007. The dramatic decline in revenue after the ability to earn cash rewards was eliminated provides further evidence that the sale of BurnLounge packages was primarily directed at participants who were interested in the Mogul program, where it was possible to earn cash rewards.

Recruiting and rewards for recruitment were integral to BurnLounge's business structure, and there was ample evidence that Moguls were meant to be, and were, primarily motivated by the opportunity to earn cash rewards for recruitment. As in *Omnitrition*, the evidence in this case shows that BurnLounge's "focus was in promoting *the program* rather than selling *the products*." *Omnitrition*, 79 F.3d at 782 (emphases in original). The district court did not err by holding that BurnLounge was an illegal pyramid scheme.

   **1. The *Omnitrition* test does not require that the rewards be completely unrelated to the sale of products.**

BurnLounge argues that the second prong of the *Omnitrition* test "requires that the rewards be completely unrelated to sales of bona fide products." The second prong of the pyramid test requires the FTC to show that the scheme provides "the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users." *Id.* at 781 (citation omitted). This test does not require that rewards be *completely* unrelated to product sales, and BurnLounge provides no support for its argument that the test should be interpreted this way.

First, reading "completely" into the test would be inconsistent with the outcome in *Omnitrition*. *See id.* at 782 (holding Omnitrition was likely a pyramid scheme because of its recruitment focus, notwithstanding the fact that Omnitrition made some retail sales).

Second, courts applying the *Koscot*/*Omnitrition* test have consistently found MLM businesses to be illegal pyramids where their focus was on recruitment and where rewards were paid in exchange for recruiting others, rather than simply selling products. *See Gold Unlimited*, 177 F.3d at 476, 481 (affirming conviction based on finding that participants bought gold and received cash payments for recruiting others to both buy gold and recruit others to do so, because rewards were paid for recruitment rather than product sales); *Stull v. YTB Int'l, Inc.*, No. 10-600-GPM, 2011 WL 4476419, at \*4–5 (S.D. Ill. Sept. 26, 2011) (denying motion to dismiss where plaintiffs adequately alleged that pyramid existed by showing focus on recruitment and payment of rewards in return for product sales, because buying the product was synonymous with being recruited into the scheme); *FTC v. Equinox Int'l Corp.*, VC-S-990969HBR(RLH), 1999 WL 1425373, at \*6 (D. Nev. Sept. 14, 1999) (ordering preliminary injunction after finding Equinox was likely a pyramid because "rewards are received by purchasing product and recruiting others to do the same"); *In re Holiday Magic, Inc.*, 84 F.T.C. 748, 1028–30 (1974) (finding a pyramid where rewards were paid to participants when they recruited others, and recruits also had to purchase product); *Peterson v. Sunrider Corp.*, 48 P.3d 918, 930 (Utah 2002) ("Even where a marketing plan formally bases commissions on sales, the plan may still be found illegal if, in practice, profits come primarily from recruitment.") (applying federal law to interpret Utah's Pyramid Scheme Act); *cf. Amway*, 93 F.T.C. at 715–17

(finding *no* pyramid where rewards were paid for product sales and not for the mere act of recruiting others).

Third, in *Koscot*, participants joined the scheme by buying inventory, and participants earned rewards by recruiting others to join the scheme, i.e., by getting recruits to buy inventory. *Koscot*, 86 F.T.C. at 1178–79. BurnLounge participants joined the scheme by buying packages, which included a BurnPage and merchandise. Participants earned rewards by recruiting others to join the scheme, i.e., by recruiting new participants to buy packages. In each of these scenarios, the participants sold something (inventory or packages), but the rewards the participants received in return were largely for recruitment, not for product sales.

In contrast, in *Amway* the FTC found that a MLM business was not an illegal pyramid scheme. *Amway*, 93 F.T.C. at 716–17. Though Amway created incentives for recruitment by requiring participants to purchase inventory from their recruiters, it had rules it effectively enforced that discouraged recruiters from "pushing unrealistically large amounts of inventory onto" recruits. *Id.* at 716. BurnLounge argues that "[t]he only difference between *Amway* and BurnLounge is that BurnLounge *did not require* inventory purchases." This argument is unpersuasive because BurnLounge required Moguls to purchase a product package to get the chance to earn cash rewards, provided cash rewards for the sale of packages by a Mogul's recruits, and had *no* rules promoting retail sales over recruitment.

The second prong of the *Omnitrition* test does not require that rewards for recruiting be "completely" unrelated to the sale of products. If it did, any illegal MLM business could save itself from liability by engaging in *some* retail sales.

Such an outcome would be clearly contrary to our case law: a pyramid scheme "cannot save itself simply by pointing to the fact that it makes some retail sales." *Omnitrition*, 79 F.3d at 782.

The rewards BurnLounge paid were primarily for recruitment, not for the sale of products. Because the outcome in this case is clear under the *Omnitrition* test, we do not need to decide the degree to which rewards would need to be unrelated to product sales in a case presenting a closer question.

### 2.  The meaning of "ultimate users."

BurnLounge also argues "that the existence of internal consumption (in this case a Mogul's purchase of a product package for use, not resale) does not constitute proof of a pyramid." Likewise, the Amicus and Appellant Taylor argue that if internal sales do not count as sales of products to ultimate users for the purpose of calculating rewards, then many legitimate MLMs will be incorrectly characterized as pyramids. These arguments also arise from the second prong of the *Omnitrition* test: "the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users." *Id.* at 781 (citation omitted).

BurnLounge claims that when recruits bought packages, they were "ultimate users" and it argues that since these sales were to "ultimate users," any rewards paid on these sales were related to the sales of products to ultimate users. The FTC counters that "internal sales to other Moguls cannot be sales to ultimate users consistent with *Koscot*." Neither of these arguments are supported by the case law.

In *Koscot*, the FTC found a cosmetics MLM business was a pyramid scheme because it focused on recruiting new participants, rather than encouraging retail sales to consumers, and new participants had to buy large amounts of inventory, ostensibly for resale. 86 F.T.C. at 1179. When participants in *Koscot* bought inventory, they could have used some of it personally, arguably making them "ultimate users." In *Amway*, though some internal consumption of inventory was common, Amway was not found to be an illegal pyramid scheme. *See Amway*, 93 F.T.C. at 716–17, 725 n.24. BurnLounge is correct that when participants bought packages in part for internal consumption (to obtain the ability to sell music through BurnPages and to use the package merchandise), the participants were the "ultimate users" of the merchandise and that this internal sale alone does not make BurnLounge a pyramid scheme. But it is incorrect to conclude that all rewards paid on these sales were related to the sale of products to ultimate users.

Whether the rewards are related to the sale of products depends on how BurnLounge's bonus structure operated in practice. *See Omnitrition*, 79 F.3d at 781. In practice, the rewards BurnLounge paid for package sales were not tied to the consumer demand for the merchandise in the packages; they were paid to Moguls for recruiting new participants. The fact that the rewards were paid for recruiting is shown by the necessity of recruiting to earn cash rewards and the evidence that the scheme was set up to motivate Moguls through the opportunity to earn cash. Rewards for recruiting were "unrelated" to sales to ultimate users because BurnLounge incentivized recruiting participants, not product sales. The FTC and other courts have consistently applied the *Omnitrition* test in this way. *See Gold Unlimited*, 177 F.3d at 476, 481; *Stull*, 2011 WL 4476419, at \*4–5; *Equinox Int'l*,

1999 WL 1425373, at *6; *Holiday Magic*, 84 F.T.C. at 1028–32; *Peterson*, 48 P.3d at 930.

BurnLounge and Arnold cite a passage from an FTC advisory letter, Exhibit 3 at trial, to argue that proof of internal consumption does not establish that BurnLounge was a pyramid. Read in its entirety, the relevant passage of the letter is consistent with the district court's analysis. The relevant passage reads:

> Much has been made of the personal, or internal, consumption issue in recent years. In fact, the amount of internal consumption in any multi-level compensation business does not determine whether or not the FTC will consider the plan a pyramid scheme. The critical question for the FTC is whether the revenues that primarily support the commissions paid to all participants are generated from purchases of goods and services that are not simply incidental to the purchase of the right to participate in a money-making venture.

As discussed above, the rewards BurnLounge paid to Moguls were primarily in return for selling the right to participate in the money-making venture—the Mogul program. The merchandise in the packages was simply incidental.

The district court correctly applied the *Omnitrition* test and its conclusion that BurnLounge was an illegal pyramid scheme was amply supported by the evidence. The fact that some sales occurred that were unrelated to the opportunity to earn cash rewards does not negate the evidence that the

opportunity to earn cash rewards was the major draw of the BurnLounge Mogul scheme.

## C. Vander Nat's Testimony

BurnLounge and Arnold moved to strike the testimony of FTC expert Dr. Peter Vander Nat as inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[6]  The district court denied the motion.  The district court did not abuse its discretion by admitting Vander Nat's testimony, and we affirm its ruling.

The admission of expert testimony is governed by Federal Rule of Evidence 702.  The Supreme Court in *Daubert* held that "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."  509 U.S. at 589.  This is a flexible inquiry and several factors must be considered.  *Id.* at 593–94.  In *Kumho Tire Co., LTD v. Carmichael*, the Supreme Court held that the trial court's gatekeeping function explained in *Daubert* applies not only to scientific testimony, but to all expert testimony.  *Kumho Tire*, 526 U.S. 137, 147 (1999).  And the Court emphasized that the *Daubert* factors are not an exhaustive checklist; rather, the trial court must base its inquiry on the facts of each case.  *Id.* at 150.  When we consider the admissibility of expert testimony, we are mindful that there is less danger that a trial court will be "unduly impressed by the expert's testimony or opinion" in a bench trial.  *Shore v. Mohave Cnty., State of Ariz.*, 644 F.2d 1320, 1322–23 (9th Cir. 1981).

---

[6] Although Taylor briefed this issue on appeal, we can find no record that he joined the motion in the district court.

Vander Nat's testimony was relevant because he testified about whether BurnLounge was a pyramid and about the amount of consumer harm. His testimony was also reliable given his doctorate in economics and advanced degree in mathematics, which he called on to interpret BurnLounge's sales data; his previous experience analyzing pyramids; his previous experiences testifying in court in five similar cases and providing expert deposition testimony in seven similar cases; his published article on the difference between pyramids and legal MLMs; and his personal experience spending several weeks analyzing BurnLounge's business model.

BurnLounge and Arnold argue that the district court's reliance on Vander Nat's mathematical projections and formulas was an abuse of discretion because "*Ger-Ro-Mar* teaches that the math is not itself sufficient." BurnLounge's reliance on *Ger-Ro-Mar, Inc. v. FTC*, 518 F.2d 33 (2d Cir. 1975), is misplaced. In that case the Second Circuit found that the FTC "relied solely upon an abstract mathematical theorem without any attempt to relate the theory to the marketplace." *Id.* at 38. Here, the FTC used Vander Nat's analysis of BurnLounge's own data to show how BurnLounge's business worked in practice. BurnLounge's data convincingly illustrated the disproportionate rate at which Moguls were motivated by the chance to earn cash rewards rather than the merchandise BurnLounge included in the packages. Vander Nat was qualified to testify and it was proper for the district court to decide that his testimony would be helpful to the trier of fact (here the court). *See Daubert*, 509 U.S. at 591–92.

BurnLounge and Arnold also argue that Vander Nat did not base his analysis on the definition of "pyramid" accepted

by this court in *Omnitrition*, and that he used his own four-pronged test. This argument fails because Vander Nat testified about pyramids in terms that do not materially differ from those used by this court in *Omnitrition*: he explained that a "pyramid scheme is an organization in which the participants obtain their monetary rewards primarily through enrolling new people into the program rather than selling goods and services to the public." The "four-prong test" referred to by Appellants included Vander Nat's consideration of BurnLounge's terms and conditions, marketing materials, an optimal scenario for the BurnLounge model (illustrating the results if all participants performed at their best), and BurnLounge's sales data. This was not a new four-prong test, and Vander Nat's consideration of these characteristics of the business was permissible. The Sixth Circuit relied on similar expert testimony regarding a MLM business's "marketing materials, organizational structure, and recruiting policies" in another pyramid case. *See Gold Unlimited*, 177 F.3d at 475, 481.

Finally, BurnLounge had a sufficient opportunity to cast doubt on Vander Nat's testimony at trial because it cross-examined him for two days. *See De Saracho v. Custom Food Mach., Inc.*, 206 F.3d 874, 880 (9th Cir. 2000).

We conclude that the district court did not abuse its discretion by admitting Vander Nat's testimony given the flexible inquiry permitted by *Daubert* and *Kumho*'s instruction that trial courts base their inquiry on the facts of the case.

## IV.  CONCLUSION

We affirm the district court's holding that BurnLounge was an illegal pyramid scheme, in violation of § 5(a) of the FTCA.  BurnLounge's scheme satisfied both prongs of the *Omnitrition* test because Moguls paid for the right to sell products, the rewards BurnLounge paid were primarily for recruitment, and Moguls were clearly motivated by the opportunity to earn cash rewards from recruitment. We reject the argument raised by BurnLounge and Arnold that the district court abused its discretion when it admitted Vander Nat's testimony because the testimony was relevant and reliable.  The district court's decision as to these two issues is **AFFIRMED.**[7]

---

[7] We discuss the district court's consumer harm calculation and the FTC's cross-appeal in a separate memorandum disposition.